IN THE SUPREME COURT OF THE STATE OF DELAWARE

CHRISTINA ZAYAS,         §
                                §     No. 232, 2021
     Claimant Below/Appellant,     §
                                  §
     v.                                 §     Court Below: Superior Court
                                  §     of the State of Delaware
STATE OF DELAWARE,          §
                                  §
     Employer Below/Appellee.     §     C.A. No. N20A-03-006

Submitted:     January 26, 2022
Decided:       March 7, 2022

Before **VALIHURA**, **VAUGHN**, and **MONTGOMERY-REEVES**, Justices.

Upon appeal from the Superior Court. **REVERSED** and **REMANDED.**

Gary S. Nitsche, Esquire, Joel H. Fredericks, Esquire, Weik, Nitsche & Dougherty, LLC, Wilmington, Delaware for Appellant.

John J. Klusman, Esquire, Megan E. Traynor, Esquire, Tybout, Redfearn & Pell, Wilmington, Delaware for Appellee.

**VALIHURA,** Justice:

Claimant Christina Zayas ("Zayas"), a paratransit bus driver, sued her employer, DART/State of Delaware ("Employer"), for injuries she sustained in a 2016 work incident where a passenger physically assaulted her (the "Incident").[1] Zayas sustained multiple injuries during the Incident. On May 2, 2019, Zayas underwent left shoulder arthroscopic surgery performed by Dr. Evan Crain ("Dr. Crain").[2] After the surgery, Zayas was placed on total disability from May 2019 through October 2019.

Zayas filed Petitions to Determine Additional Compensation Due (the "Petitions") relating to the Incident. Specifically, Zayas' Petitions sought payment of medical expenses, total disability benefits, and acknowledgement of the compensability of the surgery Dr. Crain performed in 2019. Zayas' hearing was scheduled for November 14, 2019 (the "Hearing"). Prior to the Hearing, the parties stipulated that the limited issue in dispute was whether the May 2, 2019 surgery was causally related to the Incident.

On October 1, 2019, Zayas deposed Employer's medical expert, Dr. Gregory Tadduni ("Dr. Tadduni"). At the deposition, Dr. Tadduni refused to answer questions concerning the treatment Zayas received from Dr. Damon Cary ("Dr. Cary"). Dr. Tadduni refused to discuss anything related to Dr. Cary because at the time of the Hearing, disciplinary charges were pending against Dr. Cary alleging that he had "fraudulently submitted bills to insurance carriers for physical examinations, medical discussions, and

---

[1] A006 (IAB Decision at 6 dated March 20, 2020, hereinafter, "IAB Decision").

[2] A002 (IAB Decision at 2). Dr. Crain's preoperative diagnosis was of a traumatic rotator cuff tear with post traumatic impingement syndrome. A011 (IAB Decision at 11).

2

diagnoses of medical complaints that never occurred."[3] However, none of those allegations involved his treatment of Zayas. Dr. Tadduni's repeated refusal to testify concerning Dr. Cary's treatment of Zayas prompted Zayas' petition on October 7, 2019, requesting that the Board exclude Dr. Tadduni's testimony at the Hearing.

On the day of the Hearing, the Board denied Zayas' request to exclude Dr. Tadduni's testimony. The Board explained that the prejudice to the Employer in excluding Dr. Tadduni's testimony outweighed any prejudice to Zayas.

At the Hearing during Zayas' direct examination, Zayas' counsel sought to admit Dr. Cary's medical records ("Medical Records") because the records contained evidence of Zayas' left shoulder pain between September 15, 2016 and July 26, 2018.[4] Employer objected, arguing that Zayas was not in a position to authenticate the Medical Records and that the information contained in the Medical Records was not credible due to Dr. Cary's pending disciplinary matter. After a short discussion off the record, the Board returned and sustained the Employer's objection to the admission of the Medical Records.[5]

After the Hearing, the Board issued its written decision (the "IAB Decision"). The Board held that Zayas had failed to meet her burden of proof that the surgery in 2019 was causally related to the Incident. Specifically, the Board stated, "the evidence [did] not support that [Zayas] presented with pain upon rotator cuff testing within close proximity

---

[3] A003 (IAB Decision at 3).

[4] A061 (IAB Hr'g Tr. at 38).

[5] A064 (IAB Hr'g Tr. at 41).

3

to the assault *or in Dr. Cary's records*."[6]  Notably, although the Board had excluded them, the Board stated in its Decision that the Medical Records were *admissible*.  It stated:

> The charges against Dr. Cary are pending.  Dr. Cary has not been found guilty.  There was no evidence that the allegations against Dr. Cary involved [Zayas'] case.  The treatment Dr. Cary provided to [Zayas] was not at issue or disputed but rather accepted as reasonable and necessary.  *The content of Dr. Cary's records in this case is admissible evidence.  During cross-examination, Dr. Tadduni repeatedly testified that he would not accept the validity of or acknowledge anything Dr. Cary documented because of the reasons Dr. Cary's medical license was suspended.*  The latter is the basis for [Zayas'] motion.[7]

However, a review of the record indicates that the Medical Records were never admitted into evidence.  The Superior Court did not consider this apparent inconsistency, or the issues Zayas had raised regarding the medical testimony and records.  Nevertheless, the Superior Court affirmed the Board's decision and found that substantial evidence existed to support the Board's legal conclusions.

On appeal, Zayas again argues that the Board committed legal error by not admitting her Medical Records and that it abused its discretion by admitting Dr. Tadduni's deposition testimony during the Hearing.

We conclude that Dr. Tadduni's refusal to answer relevant questions deprived Zayas of the opportunity to elicit relevant information.  In essence, Dr. Tadduni unilaterally determined that he would not answer questions concerning Dr. Cary's treatment of Zayas.  In admitting Dr. Tadduni's testimony, and simultaneously excluding the Medical Records,

---

[6] A020 (IAB Decision at 20) (emphasis added).

[7] A003 (IAB Decision at 3) (emphasis added).

4

the Board's actions prevented Zayas from adequately presenting her case, violated fundamental notions of fairness, and thereby abused its discretion.

Although the Board's ultimate conclusion was based, in part, on credibility findings of other witnesses, we are of the view that the process was so flawed that it is difficult for us to have confidence in the outcome. As a result, we **REVERSE** and **REMAND** for proceedings consistent with this decision.

## I.     *Factual and Procedural Background*

On September 2, 2016, Zayas sustained injuries while she was working as a paratransit bus driver for DART. At a scheduled stop, a male passenger assaulted a passenger sitting in front of him. The assailant was a large adult male with a mental disability. After the male (assailant) passenger got off the bus, Zayas exited the bus to escort him as required by her employment.[8] While Zayas stood in front of the bus, he assaulted her. Zayas attempted to get back into the bus, but the assailant punched her repeatedly in her face, neck, and head. Zayas fought back and eventually fell to the ground. After she fell to the ground, the assailant continued to beat her. As a result of her injuries, Zayas received medical treatment.

---

[8] A review of what has been described as footage of the Incident, described in the IAB record as Exhibit 7, reveals that incorrect video footage has been included in the record provided to this Court. The video footage included in the Appendix filed with this Court instead shows events that, according to the timestamp affixed to the video footage, transpired on October 23, 2020 at 5:01 p.m. This video does not show footage of the Incident as described by the IAB/Board and Superior Court below.

After the Incident, Zayas was treated by three different doctors: Dr. Cary, Dr. Adam Ginsberg ("Dr. Ginsberg"), and Dr. Crain.[9]

Zayas began having problems with both shoulders following the Incident and began treating with Dr. Cary. Zayas estimated that between September 15, 2016 and July 26, 2018, she treated with Dr. Cary forty-three times. During each of these visits, according to the Medical Records, Zayas presented with left shoulder complaints.[10] Dr. Cary attributed Zayas's upper extremity complaints to her neck.[11] However, Zayas continued to experience left shoulder symptoms throughout the course of treatment with Dr. Cary. In August 2018, Dr. Cary referred Zayas to Dr. Ginsberg.

Zayas complained to Dr. Ginsberg that she could not move her arm. She "described the pain as being like crushed glass."[12] Dr. Ginsberg confirmed that some of Zayas's issues stemmed from her neck. Despite this, Dr. Ginsberg suspected shoulder involvement and gave Zayas an injection in her shoulder. Within five minutes of receiving the injection, Zayas was able to move her left arm freely, lift things without pain, and otherwise had complete relief. Zayas rated her pain at a zero on a ten-point scale. Thereafter, Dr. Ginsberg referred Zayas to Dr. Crain to treat her left shoulder.

---

[9] A006–07 (IAB Decision at 6–7). Zayas was involved in two prior work accidents -- one in 2011 and one in 2014. For those two prior incidents, Zayas was treated by Dr. Cary and Dr. Ginsberg. A006.

[10] A006 (IAB Decision at 6). Zayas confirmed that she raised left shoulder complaints at these visits when she testified after reviewing the Medical Records.

[11] *Id.*

[12] A007 (IAB Decision at 7).

On September 27, 2018, Zayas met with Dr. Crain for the first time. After an examination, Dr. Crain "summarized that [Zayas] had shoulder pain, pain with rotator cuff maneuvers and impingement maneuvers, but [Zayas] had much less pain than she had prior to receiving the injection."[13] On February 14, 2019, Zayas underwent an MRI of the left shoulder. Upon review, "Dr. Crain thought there was a high-grade bursal surface rotator cuff tear, almost full thickness but no major retraction."[14] Dr. Crain's main findings were abnormalities of the rotator cuff suggestive of a rotator cuff injury and a tear. He reviewed the MRI results with Zayas on April 15, 2019. After an examination, Dr. Crain recommended surgery as he believed that Zayas suffered from a traumatic rotator cuff tear with posttraumatic impingement syndrome.

On May 2, 2019, Dr. Crain performed the surgery. Intraoperatively, he noted a complete tear of the supraspinatus, a loose flap of labrum consistent with a Type I tear, and a partial tear of the biceps. "Dr. Crain debrided the structures, repaired the rotator cuff and did an arthroscopic decompression."[15] According to Zayas, the surgery was successful in curing her shoulder issues.

On September 24, 2019, Dr. Crain was deposed by Zayas's attorney and the Employer's attorney. During his deposition, Dr. Crain confirmed the following: (i) he had examined Dr. Cary's records and Dr. Cary mentioned in the Medical Records that on every

---

[13] A010 (IAB Decision at 10).

[14] A011 (IAB Decision at 11).

[15] *Id.*

7

visit, Zayas had "a diagnosis related to her left shoulder" from the Incident;[16] (ii) Zayas had "complaints of pain and some findings on physical exam[s] documented by Dr. Cary;"[17] and (iii) Dr. Cary's report, dated December 16, 2017, stated that Zayas's left shoulder problem, among other injuries, was one hundred percent related to the Incident. Dr. Crain testified that he agreed with Dr. Cary's conclusion regarding the causal connection between Zayas' left shoulder problem and the Incident.[18]

On October 1, 2019, Dr. Tadduni was deposed by the parties' respective attorneys. Generally, Dr. Tadduni did not take issue with the "reasonableness and necessity of the treatment performed by Dr. Crain or . . . the surgery that he performed."[19] Although Dr. Tadduni answered questions about Dr. Ginsberg and Dr. Crain's medical findings regarding Zayas' injury and treatment, Dr. Tadduni refused to answer questions on cross-examination about Dr. Cary's medical findings due to Dr. Cary's pending disciplinary charges.[20] Dr. Tadduni "repeatedly testified that he would not accept the validity of or acknowledge anything Dr. Cary documented" because Dr. Cary's medical license was suspended on an emergency basis as a result of the pending charges.[21]

On November 14, 2019, the IAB conducted the Hearing. At the start of it, Zayas'

---

[16] A206 (Dr. Crain Dep. at 6).

[17] *Id.*

[18] *Id.*

[19] A282 (Dr. Tadduni Dep. at 24).

[20] A295–99, A302–08 (Dr. Tadduni Dep. at 37–41, 44–50). *See also* Appendix A to this opinion.

[21] A003 (IAB Decision at 3).

8

counsel presented a motion to exclude Dr. Tadduni's deposition testimony due to Dr. Tadduni's refusal to answer questions concerning Dr. Cary's treatment and records.[22] Zayas' counsel argued that the Medical Records directly contradicted Dr. Tadduni's opinion. Further, Dr. Tadduni's refusal to testify concerning the Medical Records significantly prejudiced Zayas by precluding relevant impeachment questions related to his opinions.[23] For example, Dr. Tadduni had testified on direct examination that: "I think what you have to look at is the period after the injury where she's examined multiple times, twice by me, and she's not sent for an MRI of her shoulder at any point *because she doesn't really have symptoms or findings that point to a left shoulder problem*."[24] The Board denied Zayas's motion and stated that such conduct would affect the weight of the evidence being presented.[25]

During Zayas' direct testimony, Zayas' counsel sought to admit Zayas' Medical Records into evidence.[26] Counsel for Employer objected and argued that Zayas was not in

---

[22] A028–32 (IAB Hr'g Tr. at 5–9); *see also* A333–40 (Zayas's October 7, 2019 Letter Requesting to Exclude Dr. Tadduni Testimony.).

[23] A032 (IAB Hr'g Tr. at 9). Zayas's counsel raised a prior instance where Dr. Tadduni behaved similarly. In 2018, Dr. Tadduni "refused to answer any questions [in another matter] about medical records of [a different doctor] that contradicted statements that Dr. Tadduni was making with regard to what was in the record." A031 (IAB Hr'g Tr. at 8). Zayas's counsel asserted that there is a pattern of inappropriate and unprofessional conduct by a doctor who is not "comp certified," who does not treat patients in Delaware, whose sole involvement in Delaware is doing defense medical examinations and testifying before the Board. A032 (IAB Hr'g Tr. at 9).

[24] A274 (Tadduni Dep. at 16) (emphasis added).

[25] A038 (IAB Hr'g Tr. at 38). The Board was "sympathetic" to the objections of the Employer's counsel and instructed Zayas's counsel to "move on" after reading from Dr. Tadduni's deposition. A149 (IAB Hr'g Tr. at 126).

[26] A061 (IAB Hr'g Tr. at 38).

9

a position to authenticate the Medical Records and that those records were unreliable due to Dr. Cary's pending disciplinary action. Zayas's counsel argued that if the Board did not admit the Medical Records, Zayas would have no way of getting this evidence in front of the Board due to Dr. Tadduni's prior refusal to answer questions.[27] Additionally, Zayas's counsel argued that the emergency suspension of Dr. Cary was inadmissible for any consideration by the Board because, according to a Superior Court case, a suspension is not a finding.

After a short discussion off the record, "[t]he Board sustained [Employer's] objections to allowing [Zayas] to testify about the content of Dr. Cary's medical records and to admitting Dr. Cary's medical records into evidence."[28] Further, the Hearing Officer stated, with regard to Zayas's counsel's argument that there would be no way of getting the Medical Records evidence in front of the Board, that Zayas had her "own doctor to be able to talk about what was in those records."[29] But the testimony provided by Dr. Crain was pre-recorded, as was Dr. Tadduni's testimony, and Dr. Crain's deposition preceded Dr. Tadduni's. Dr. Crain was deposed on September 24, 2019.[30] Dr. Tadduni was deposed

---

[27] A063 (IAB Hr'g Tr. at 40). Employer's counsel responded that Zayas's counsel could have subpoenaed Dr. Cary or could have gone through the records with Dr. Crain. Zayas's counsel then countered that Dr. Crain testified before Dr. Tadduni and that "Dr. Cary will not testify." A064 (IAB Hr'g Tr. at 41).

[28] A006 (IAB Decision at 6 n.4).

[29] A065 (IAB Hr'g Tr. at 42).

[30] A201–58 (Dr. Crain Dep.). Dr. Crain is a board-certified provider under the Workers' Compensation Guidelines who has testified on behalf of both claimants and employers. A204–05 (Dr. Crain Dep.).

on October 1, 2019.[31]  Zayas argued that she should not be expected to have anticipated Dr. Tadduni's improper deposition conduct.

On March 20, 2020, the Board issued the IAB Decision.[32]  As a preliminary matter, the Board addressed Dr. Tadduni's conduct during his deposition.  Specifically, during his deposition, Dr. Tadduni was obstructive and disrespectful to Zayas's counsel.[33]  The Board noted that this was not the first time Dr. Tadduni had refused to respond to questioning. Further, the Board noted that Dr. Tadduni is not licensed to practice medicine in Delaware.[34]  Nor is he a certified provider under the Delaware Workers' Compensation Healthcare Payment System.  Rather, according to the IAB Decision, "[h]is only

---

[31] A259–332 (Dr. Tadduni Dep.).

[32] A001–22 (IAB Decision).

[33] A003–04 (IAB Decision at 3–4).  The IAB Decision states that:

> In Dr. Tadduni's repeated refusals to respond to questioning, he continually obstructed deposition proceedings, insulted [Zayas'] counsel, inappropriately challenged [Zayas'] counsel's ethics, wasted much time, and increased the fees associated with his deposition.  Furthermore, Dr. Tadduni unilaterally made a legal decision (a decision to be made by the Board) that such evidence was not relevant, credible or admissible.

A004 (IAB Decision at 4) (citations to Dr. Tadduni Dep. omitted).

[34] In his deposition, Dr. Tadduni testified as follows:

> Q.  Doctor, do you practice in Delaware?
>
> A.  No.
>
> Q.  Do you treat any patients in Delaware or have any privileges to perform surgery in Delaware?
>
> A.  No.
>
> Q.  Your interactions with Delaware, is that solely for the purpose of performing defense medical examinations?
>
> A.  Correct.

A313 (Dr. Tadduni Dep. at 55).

11

involvement in Delaware pertaining to workers' compensation cases related to profiting from performing defense medical examinations and from providing medical expert testimony."[35] The Board stated that it was referring Dr. Tadduni to the Division of Professional Regulation. It also warned that if he repeated this conduct, "the Board will consider referring Dr. Tadduni to the Delaware Attorney General's office to pursue before the Delaware Superior Court a finding of contempt."[36] Separately, citing this Court's decision in *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*,[37] the Board stated that, "Employer's counsel should have directed Dr. Tadduni to cooperate with cross-examination."[38]

After addressing Dr. Tadduni's misconduct, the Board explained that Zayas failed to meet her burden of proof that the surgery on her left shoulder was causally related to the Incident. The Board specified three reasons underlying its decision: (1) it found Dr. Tadduni to be more credible than Dr. Crain because Dr. Crain did not explain how the injury could have caused the tears; (2) the video captured Zayas falling onto her right side, rather than her left side; and (3) "the evidence [did] not support that [Zayas] presented with pain upon rotator cuff testing within close proximity to the assault *or in Dr. Cary's records*."[39]

---

[35] A005 (IAB Decision at 5).

[36] *Id.* (citing 19 *Del. C.* § 2320(6)).

[37] 213 A.3d 39, 78 (Del. 2019).

[38] A005 (IAB Decision at 5).

[39] A020 (IAB Decision at 20) (emphasis added). We note that in her briefing on appeal, Zayas contends that she also fell on her left side. She states that that part of her fall was captured on the

Zayas timely appealed to the Superior Court. On appeal, Zayas argued that: (1) the Board erred in admitting the testimony of Dr. Tadduni and that his refusal to respond to questions on cross-examination regarding Dr. Cary's records rendered his opinion unreliable under Delaware Rule of Evidence 702; and (2) the Board erred in excluding Zayas's Medical Records that it later acknowledged were relevant and admissible.[40] Zayas argued that the substance of these records directly contradicted the basis of Dr. Tadduni's opinion and related to the heart of the issue in controversy. The Superior Court, in affirming the IAB Decision, determined that "the Board had sufficient evidence to conclude that Zayas had failed to meet her burden of proof that her left shoulder injury was causally related to the September 2016 assault,"[41] and that the IAB Decision was "free from legal error."[42]

The Superior Court did not address the Board's decision to exclude the Medical Records.[43] Nor did it address the Board's refusal to strike Dr. Tadduni's testimony.

---

video also, and that the video did not capture the entire Incident. Opening Br. at 1. *See also* A158 (IAB Hr'g Tr. at 135). Her counsel stated that the video depicted her being hit "close to 30 times." A159 (IAB Hr'g Tr. at 136).

[40] A432–33 (Superior Ct. Op. at 20–21).

[41] A440–41 (Superior Ct. Op. at 28–29).

[42] *Id.*

[43] *See, e.g.*, A411–412 (Notice of Appeal to Delaware Superior Court) (The Notice provides the following: "4. The Board erred as a matter of law in permitting the testimony of Employer's expert, Dr. Gregory Tadduni. 5. The board erred as a matter of law in precluding the Claimant from admitting her medical records, including records of Dr. Damon Cary, into evidence at the hearing."). The Medical Records are included in Appellant's Appendix filed with this Court. A341–94 (Zayas' Medical Records from Dr. Cary). However, the Medical Records do not appear in the record below based upon our review of that record.

The Superior Court relied largely on the Board's credibility determinations that Zayas was not credible and that Zayas had failed to show that the Board acted unreasonably or capriciously in crediting the Employer's medical expert over Dr. Crain. The Superior Court concluded that:

> It is solely the Board's function to weigh the evidence and to make credibility determinations. The Board is free to rely on either expert; thus, the Board was entitled to accept Dr. Tadduni's opinion as more persuasive regarding the causal relationship between [Zayas'] left shoulder injury and the incident. Therefore, the Board did not commit legal error by accepting Dr. Tadduni's opinion over Dr. Crain's.[44]

Thereafter, Zayas timely appealed to this Court.

## II.  Standard of Review

"The review of an Industrial Accident Board's decision is limited to an examination of the record for errors of law and a determination of whether substantial evidence exists to support the Board's findings of fact and conclusions of law."[45] "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[46]

"On appeal, this Court will not weigh the evidence, determine questions of credibility, or make its own factual findings."[47] "Weighing the evidence, determining the credibility of witnesses, and resolving any conflicts in the testimony are functions reserved

---

[44] A440 (Superior Ct. Op. at 28).

[45] *Roos Foods v. Guardado,* 152 A.3d 114, 118 (Del. 2016) (citing *Stanley v. Kraft Foods, Inc.*, 2008 WL 2410212, at *2 (Del. Mar. 24, 2008)).

[46] *Id.* (citing *Olney v. Cooch*, 425 A.2d 610, 614 (Del. 1981)).

[47] *Id*. (citing *Person-Gaines v. Pepco Holdings, Inc.*, 981 A.2d 1159, 1161 (Del. 2009)).

14

exclusively for the Board."[48] "When determining the reliability of an expert's opinion, the Board must make a determination of the reliability of the sources on which the expert relied."[49] Further, "[t]he Board is not required to accept medical evidence that it deems unreliable[.]"[50] Moreover, where factual determinations are at issue, this Court takes due account of the Board's experience and specialized competence and of the purposes of Delaware's worker's compensation statute.[51]

If the Board decided legal issues, this Court reviews them *de novo*.[52] If there is no error of law and substantial evidence supports the Board's findings, "the Board's decision must be affirmed."[53]

### III.       *Analysis*

In considering the evidentiary issues presented here, we note at the outset that "[a]dministrative agencies operate less formally than courts of law."[54] For example, how the rules of evidence apply to IAB hearings is set forth under Section 1331 of the Industrial

---

[48] *Powell v. OTAC, Inc.*, 223 A.3d 864, 870 (Del. 2019) (citing *Noel-Liszkiewicz v La-Z-Boy*, 68 A.3d 188, 191 (Del. 2013)).

[49] *Adams v. F. Schumacher & Co., Inc.*, 886 A.2d 1277, 2005 WL 2895105, at *2 (Del. Nov. 1, 2005) (TABLE) (citing *Fensterer v. State*, 509 A.2d 1106, 1110 (Del. 1986)).

[50] *White v. Volt Services*, 35 A.3d 420, 2011 WL 6826438, at *1 (Del. Dec. 22, 2011) (TABLE).

[51]*Spellman v. Christiana Care Health Servs.*, 74 A.3d 619, 623 (Del. 2013).

[52] *Oceanport Indus., Inc. v. Wilm. Stevedores, Inc.*, 636 A.2d 892, 899 (Del. 1994) (internal quotation marks omitted).

[53] *Stevens v. State*, 802 A.2d 939, 944 (Del. Super. 2002) (citing *Breeding v. Contractors-One-Inc.*, 549 A.2d 1102, 1104 (Del. 1988)).

[54] *Standard Distrib. Co. v. Nally*, 630 A.2d 640, 647 (Del. 1993).

Accident Board Regulations (the "Regulations"). Specifically, Section 1331.14.3 of the

Regulations provides:

> The rules of evidence applicable to the Superior Court of the State of Delaware shall be followed insofar as practicable; however, that evidence will be considered by the Board which, in its opinion, possesses any probative value commonly accepted by reasonably prudent persons in the conduct of their affairs. *The Board may, in its discretion, disregard any customary rules of evidence and legal procedures so long as such a disregard does not amount to an abuse of its discretion.*[55]

An abuse of discretion occurs when the Board's decision has "exceeded the bounds of

reason in view of the circumstances, [or] so ignored recognized rules of law or practice as

to produce injustice."[56]

Further, Section 1331.10.6 of the Regulations sets forth the scope of administrative

depositions, which provides that "[t]he deponent may be examined regarding any matter,

---

[55] 19 Del. Admin. C. § 1331-14.3. *See Standard Distributing, Inc. v. Hall*, 897 A.2d 155, 157 (Del. 2006) (noting that "[w]hile the Board operates 'less formally than courts of law,' and 'the rules of evidence do not strictly apply,' it is nonetheless an adversarial proceeding where the rules of evidence apply insofar as practicable.") (citing *Standard Distributing Co. v. Nally*, 630 A.2d 640, 647 (Del. 1993)). *See also Paulley v. Second String, LLC d/b/a Hammerheads Dockside*, No. 1478726 (I.A.B. Oct. 9, 2019) ("[T]he Board will only consider evidence which in its opinion, possesses any probative value commonly accepted by reasonably prudent persons in the conduct of their affairs."). *See also Carey v. Bryan and Rollins*, 105 A.2d 201, 203–05 (Del. Super. 1954) (holding that, where a question regarding claimant's intoxication during the time of the accident was material, it was an error for Unemployment Industrial Accident Board ("UIAB") to permit the claimant to refuse to answer the question). The Superior Court further held, if the claimant continued to refuse answering material questions regarding the issue of intoxication, that the UIAB *may* strike all of the claimant's testimony regarding the accident. *Id.*

[56] *Roos Foods*, 152 A.3d at 118 (alteration in original) (quoting *Lilly v. State*, 649 A.2d 1055, 1059 (Del. 1994)); *see e.g.*, *Abrahams v. Chrysler Grp., LLC.*, 44 A.3d 921, 2012 WL 1744270 (Del. May 11, 2012) (TABLE). In *Abrahams*, the Court ruled that the "IAB improperly permitted Chrysler's attorney to offer what amounted to expert testimony during her closing argument. This maneuver, defended before this Court as a tactical decision, violated fundamental notions of fairness by depriving Abrahams of the opportunity to dispute the facts material to the outcome of his case." *Id.* As a result, the Court determined that this case represented an abuse of discretion. *Id.*

16

not privileged, which is relevant to the subject matter involved in the pending action."[57]  In refusing to strike Dr. Tadduni's testimony, the Board reasoned that Dr. Tadduni's testimony should be admitted because: (1) the Employer would have no medical expert to testify on its behalf; (2) Zayas had the opportunity to elicit the information contained in Dr. Cary's records during the deposition of Dr. Crain; and (3) the prejudice to the Employer outweighed the prejudice to Zayas by allowing the testimony.  The Board attempted to ameliorate any such prejudice by stating it would factor Dr. Tadduni's refusal to cooperate into its deliberations when weighing the evidence.

But we hold that it was improper for Dr. Tadduni to unilaterally determine that he did not have to testify about the Medical Records.  Dr. Tadduni's refusal to answer relevant questions, and the Employer's counsel's failure to address this conduct, deprived Zayas of the opportunity to elicit relevant information material to the outcome of her case, and to effectively cross-examine Dr. Tadduni about his medical opinion.[58]  Accordingly, the Board abused its discretion by admitting Dr. Tadduni's testimony.  Furthermore, the Board's exclusion of the Medical Records, which it stated constituted relevant and "admissible evidence," also reflects an internal inconsistency and illogical process.[59]

---

[57] 19 Del. Admin. C. § 1331-10.6.

[58] Appendix A (attached hereto) contains illustrative excerpts of Dr. Tadduni's deposition.

[59] We also acknowledge Zayas's explanation that she did not attempt to elicit such information during Dr. Crain's deposition because Dr. Crain had appeared via an earlier pre-recorded deposition and Zayas had not anticipated that Dr. Tadduni would improperly refuse to answer questions about Dr. Cary's treatment of Zayas.

17

Moreover, given the Board's statement that the Medical Records were relevant and admissible, and given Dr. Tadduni's testimony that he would not acknowledge anything Dr. Cary documented, Zayas's argument that Dr. Tadduni's testimony lacked a factual foundation and was based on an incomplete medical history has significant force. As we explained in *Perry v. Berkley*, "[t]his Court has adopted the United States Supreme Court holding in *Daubert*, which requires that an expert's opinion be based upon a *proper factual foundation* and sound methodology to be admissible."[60] Pursuant to that rule, any expert who testifies must satisfy Delaware Rule of Evidence ("D.R.E.") 702 in order for his or her testimony to be admissible as evidence. If an expert's opinion lacks a factual foundation, then the opinion is not valid.[61]

In *Perry*, this Court affirmed the decision of the trial court's exclusion of the testimony of plaintiff's medical expert and its dismissal of the case due to lack of evidence of causation. The plaintiff in *Perry* alleged that she sustained back injuries as the result of a motor vehicle accident. Plaintiff's only medical expert opined that the accident caused plaintiff's back injury because she had not experienced any back pain prior to the accident. However, plaintiff's expert had not personally treated her after the accident and based his opinion on medical records and the plaintiff's self-reports. Although Perry's counsel had advised plaintiff's expert that the plaintiff had been treated for back pain prior to the accident in question, the expert "apparently did not read those communications . . . because

---

[60] *Perry v. Berkley*, 996 A.2d 1262, 1267 (Del. 2010) (emphasis added).
[61] *Id.* at 1265.

18

at his 2009 deposition [the expert] testified that he had no knowledge of Perry's pre-existing back condition and prior treatments for pain."[62] Because the expert's opinion was premised on the incorrect assumption that the plaintiff had not previously experienced back pain, the trial judge excluded the expert's testimony on the grounds that it lacked the proper factual foundation.[63]

Zayas compares Dr. Tadduni's lack of a factual foundation to that of the medical expert's in *Perry*. Zayas argues that Dr. Tadduni opined that she failed to "demonstrate left shoulder symptoms for nearly two years before she was referred to Dr. Crain,"[64] but that Dr. Cary's records confirm that Zayas had continued complaints of left shoulder symptoms during that period.

---

[62] 996 A.2d at 1266.

[63] Specifically, the trial judge expressed concern about the factual basis for the medical expert's opinion, stating that:

> [Y]our doctor, [] predicates his opinion as to causation on the lack of any complaints by your client [] as to her low back prior to the accident, . . . and that the trauma was causally related to the herniation . . . how can that opinion be valid when [the expert] didn't know—when you[r] client didn't tell him about the previous low-back complaints and it was never disclosed to him that she had been diagnosed with herniation before the accident.

*Id.* at 1266. The Superior Court continued to express its concern by stating that "it's really a *Daubert* problem. This motion, as I see it, doesn't focus on qualifications or competence or methodology or science involved, it focuses on factual foundation. And if the factual foundation isn't there, the opinion is not valid." *Id.*

[64] Opening Br. at 27. Dr. Tadduni testified that Zayas did not have any left shoulder symptoms for two years following the Incident. A274 (Dr. Tadduni Dep. at 16). Zayas argues that his testimony disregards her forty-three visits to Dr. Cary which the Employer paid for where she specifically complained of left shoulder problems. *See also Durmmond Fuel Oil v. O'Neal*, 734 A.2d 1060, 1065 (Del. 1999) (stating that treating physicians have great familiarity with a patient's condition and their opinions should be given substantial weight).

19

Employer contends that Zayas misapplies *Perry* because in *Perry*, the medical expert "rendered an expert opinion based on a completely incorrect case specific factual predicate."[65] Employer attempts to distinguish this case from the *Perry* case by arguing that Dr. Tadduni "had knowledge of the facts of the case, and the injuries sustained by [Zayas]" and that Dr. Tadduni "based his opinion that [Zayas'] surgery was not casually related to the [I]ncident on the fact that he found no left shoulder complaints until [Zayas] saw Dr. Ginsburg in August of 2018, almost two years after the [I]ncident."[66]

But according to the testimony of Dr. Crain and Zayas, Dr. Tadduni's factual foundation contradicts the Medical Records that documented Zayas' complaints of left shoulder injury. The Board said the Medical Records were "relevant" and "admissible" but excluded them. According to Zayas, given Dr. Tadduni's refusal to respond to questions during cross examination, it was unclear whether Dr. Tadduni had even reviewed the Medical Records prior to arriving at his opinion.[67]

This situation resembles the situation in *Perry*. Dr. Tadduni predicated his opinion, at least in part, on the lack of any complaints by Zayas as to her left shoulder. However, Zayas' Medical Records documented numerous complaints regarding her left shoulder. Notwithstanding the professional issues in which Dr. Cary was involved, Dr. Tadduni's

---

[65] Answering Br. at 20 (quoting *Perry*, 996 A.2d at 1271).

[66] *Id.* (citing A288 (Dr. Tadduni Dep. at 30)).

[67] *See* Opening Br. at 27–28 ("Dr. Tadduni's outright refusal to answer any questions regarding those records let the Board, and the Superior Court, unable to conclude whether those records [from Dr. Cary] were even considered in [Dr. Tadduni's] opinion at all. In fact, at one point, [Dr. Tadduni] indicated the records may have never been provided to him.").

20

refusal to acknowledge, consider and to respond to cross-examination as to critical facts that go to the heart of the factual basis for his opinion, lead us to conclude that his opinion was based upon an incomplete factual predicate. The Board's process violated fundamental notions of fairness, and it therefore, abused its discretion. Accordingly, we hold that the Board should have stricken Dr. Tadduni's testimony. The Board's errors were not harmless as the dueling experts were central to Zayas's case.[68]

Finally, the Employer's counsel should not have tolerated Dr. Tadduni's deposition misconduct. We made clear in *Shorenstein* that such deposition misconduct is not acceptable Delaware practice. As we said there, that "[d]epositions are court proceedings, and counsel defending the deposition have an obligation to prevent their deponent from impeding or frustrating a fair examination."[69] We also said that, "[l]awyers have an obligation to ensure that their clients do not undermine the integrity of the deposition proceedings by engaging in bad faith litigation tactics; they cannot simply sit and passively observe as their client persists in such conduct."[70] In any proceedings on remand, Dr. Tadduni's deposition taken in this case shall not be admitted for any purpose.

---

[68] *See, e.g.*, *Abrahams v. Chrysler Group LLC*, 44 A.3d 921, 2012 WL 1744270, at *4 (reversing and stating that, "[t]his case, at its heart, was about dueling experts, and an attempted impeachment of an expert without notice and an opportunity for the parties offering the expert to respond might well have determined the outcome."). As Zayas's counsel aptly noted at the close of the Hearing, Dr. Tadduni's credibility was at issue -- "[t]he credibility of the person who while he profits from our workers' compensation system, fails to fairly participate in it and engage in discussion through way of deposition." (IAB Hr'g Tr. at 159).

[69] 213 A.3d at 78.

[70] *Id*. at 79.

## IV.  Conclusion

For the reasons set forth above, we **REVERSE** the Superior Court's order, and **REMAND** for proceedings consistent with this opinion.

## Appendix A

The following are selected excerpts from Dr. Tadduni's deposition:

[Mr. Fredericks]: You reviewed the medical records of Dr. Cary; correct?[71]

[Dr. Tadduni]: I'm not even gonna talk about medical records of Dr. Cary. That would have absolutely no relevance to me at all and I think you know why.

[Mr. Fredericks]: Doctor, I'm gonna just ask you to answer my questions.

[Dr. Tadduni]: I'm gonna tell you that anything in the medical records of Dr. Cary would have absolutely no relevance to me –

[Mr. Fredericks]: Okay.

[Dr. Tadduni]: -- and you know why.

[Mr. Fredericks]: Okay. And, again, just do me a favor and just answer the questions unless Mr. Klusman --

[Dr. Tadduni]: I answered the question. Nothing in Dr. Cary's records would have any relevance to me, so even if I mention them in my report, that would have been by mistake --

[Mr. Fredericks]: Okay.

[Dr. Tadduni]: -- in retrospect.

[Mr. Fredericks]: I'm just trying to understand what you reviewed. Did you review --

[Dr. Tadduni]: No, that's not what you're trying to do. I'm not going to tell you what Dr. Cary said because it's obviously not relevant to any of us. It's not relevant to you. It's not relevant to the Board. It's not relevant to Mr. Klusman.

---

[71] Mr. Fredericks is Zayas's counsel. The telephone deposition was taken on October 1, 2019. (A259–A332).

[Mr. Fredericks]: I understand that it may not be relevant to the Employer or to you. I understand that. It is relevant to me as --

[Dr. Tadduni]: Well, it shouldn't be. It shouldn't be and you know it shouldn't be.

[Mr. Fredericks]: Doctor --

[Dr. Tadduni]: You know it shouldn't be.

[Mr. Fredericks]: Doctor, I'm trying to be incredibly polite and respectful.

[Dr. Tadduni]: And I'm being polite too. I'm being polite too. You're bringing up something that is absurd.

[Mr. Fredericks]: Doctor, can you tell me whether you reviewed the treatment records of Dr. Cary.

[Dr. Tadduni]: I'm not even discussing Dr. Cary.

[Mr. Fredericks]: All right.

[Mr. Fredericks]: Mr. Klusman, if the Doctor refuses to answer questions, and if you think my question is inappropriate, certainly let me know, but if the Doctor refuses to answer questions from me that are reasonable and relevant, I'm gonna have to strike his testimony. I don't want to have to do that.

[Mr. Klusman]: Well, Joel, you'll do whatever you think is appropriate. You have the opportunity to ask him whatever you want and he's got the opportunity to answer in the way he sees fit.

We all know that Dr. Cary's been suspended for fraudulently preparing medical records which document diagnoses that are not accurate, not offered by the patient, complaints that were not offered by the patient and then submitting those records to insurance for payment based on those fraudulent records, so that's I think the basis of Dr. Tadduni's opinions. I can't help you any more than that.

[Mr. Fredericks]: But he also hasn't been found guilty of any of those things. It's a complaint and it's still pending and he's entitled to a hearing at this point and, again, these are treating doctor's records, treating doctor's records that are in his own report. Perhaps if you let him know that this information

24

is relevant and admissible, maybe that would change some of his testimony. I'm just trying to think of the path of least resistance, Mr. Klusman. I'm trying to get through this as expeditiously as possible.

[Mr. Klusman]: I guess, Joel -- I can't tell – I'm not gonna tell the Doctor to answer questions that he doesn't feel comfortable answering.

[Dr. Tadduni]: You're asking me to perpetrate a fraud on the Board? Is that what it is?

[Mr. Fredericks]: Doctor, I'm asking you to answer clear and relevant questions.

[Dr. Tadduni]: No. You're asking me to perpetrate a fraud on the Board. His license was emergently revoked. Emergently revoked; okay? And you're gonna ask me to talk about what Dr. Cary found?

[Mr. Klusman]: Joel, you're gonna have to move on. Doctor clearly is not comfortable answering these questions relying on Dr. Cary's records.[72]

. . .

[Mr. Fredericks]: So let me be clear. Is there anything specifically that says left shoulder in any of those records?

[Dr. Tadduni]: No.

[Mr. Fredericks]: Is there any diagnosis as to the left shoulder in any of those records?

[Dr. Tadduni]: No, and that's consistent with the fact that when I see her in 2016 she also doesn't complain specifically about the shoulder. She has complaints everywhere and her exam is negative with regard to the shoulder, so that would be consistent with that.

[Mr. Fredericks]: All right. But when she goes to see Dr. Cary after the assault the first visit on September 15, 2018 she's complaining of left shoulder complaints specifically and she's diagnosed with a left shoulder condition; correct?

---

[72] A295–298 (Tadduni Deposition at 37–40).

[Dr. Tadduni]: How could we possibly know that? It's Dr. Cary. We can't possibly know what she actually complained of on that day.[73]

. . .

[Mr. Fredericks]: On the physical examination it shows tenderness and restricted range of motion as to the left shoulder. Do you agree?

[Dr. Tadduni]: Again, I'm not – I am not gonna substantiate the physical exam of somebody whose license has been emergently revoked. I'm not doing that.

[Mr. Fredericks]: Doctor, all you have to say is *I'm not answering* and I can move on. You just have to say *I'm not answering* and I can move on.

[Dr. Tadduni]: So why do you keep pressing this? I would think that you'd be embarrassed to ask that question. You should be embarrassed to ask that question.

[Mr. Fredericks]: Doctor, I can appreciate your opinion but I have a job that I have to do.

[Dr. Tadduni]: Right. And it doesn't matter how you do it. Throw whatever you want on the wall and maybe some of it'll stick.[74]

. . .

[Mr. Fredericks]: All right. I want to jump back to the questions again. If you're not gonna answer it, just say you're not gonna answer. I'm actually going to instead go through them individually just lump them all together -- okay? – for the purposes of time. I took a look at Dr. Cary's records after this injury, this assault, included evaluations and therapy, and there was a reference to a shoulder problem in almost all the records, and I pulled out a few dates. I'm just gonna go through them: September 20th, 2016; October 6th, 2016; October 18th, 2016; October 25th, 2016; December 8th; 2016; January 5th, 2017; February 7th, 2017; March 16th, 2017; April 18th, 2017; May 23rd, 2017; July 6th, 2017; and August 17, 2017. I stopped at about a year. Do you have any reason to dispute that there are references to problems with the left shoulder in those records?

---

[73] A301–302 (Tadduni Deposition at 43–44).

[74] A303 (Tadduni Deposition at 45).

[Dr. Tadduni]: I'm not gonna substantiate records of Dr. Cary, so you can testify if you're allowed to testify, but I'm not gonna testify to that. I'm also looking at Dr. Gelman's report. It seems like the diagnoses he makes do not mention the left shoulder. Cervical spine. Lumbosacral spine. I don't see that he makes a left shoulder diagnosis.[75]

. . .

[Mr. Fredericks]: So if you were in that position of a pain management doctor, not an orthopedic surgeon, not a specialist, when that problem is going on for a year, wouldn't it be reasonable at that point to send a person to a specialist or for an MRI?

[Dr. Tadduni]: It would be, yes.

[Mr. Fredericks]: Dr. Cary didn't do that though; right?

[Dr. Tadduni]: You really just want to prolong this unnecessarily.

[Mr. Fredericks]: Well, not really. But Dr. Cary didn't do that; right?

[Dr. Tadduni]: I told you I'm not gonna testify to what Dr. Cary did or said or didn't do.[76]

. . .

[Mr. Fredericks]: Again, I'm gonna keep going with Dr. Cary. We stopped in August 2017. She continued to treat with Dr. Cary up until the time he referred her to Dr. Ginsberg in August of 2018 with continued consistent references to the left shoulder. Do you have any reason to dispute that?

[Dr. Tadduni]: Yes, I have reason to dispute it.

[Mr. Fredericks]: Do you have any reason to dispute that that is what is noted in the records, Doctor?

---

[75] A305–306 (Tadduni Deposition at 47–48).

[76] A307 (Tadduni Deposition at 49).

27

[Dr. Tadduni]:  I'm not gonna testify to his records. I told you that.  If you can testify, then testify.  Why don't you bring him in, let him testify.[77]

. . .

[Mr. Fredericks]:  This opinion that you hold of Dr. Cary, is it an opinion that you formed before any issues with his medical license? Is this an opinion that you've held before then or since then?

[Dr. Tadduni]:  I'd say it's a combination.

[Mr. Fredericks]:  Okay.  He's not a doctor that you're particularly fond of; is that fair?

[Dr. Tadduni]:  I'm sure he's a doctor you're particularly fond of.[78]

---

[77] A308 (Tadduni Deposition at 50).

[78] A317–318 (Tadduni Deposition at 59–60).