DIAMOND FUEL OIL, Employer–
Appellee Below, Appellant,

v.

John S. O'NEAL, Employee–Appellant
Below, Appellee.

No. 399, 1998.

Supreme Court of Delaware.

Submitted: July 20, 1999.
Decided: Aug. 16, 1999.

Anthony M. Frabizzio, Heckler, Frabizzio & Durstein, Wilmington, Delaware, for appellee.

Edward B. Carter, Jr., Kimmel, Carter, Roman & Peltz, P.A., Wilmington, Delaware, for appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, HARTNETT, and BERGER, Justices, constituting the Court en Banc.

WALSH, Justice:

In this appeal we consider the issue of a claimant's burden of proof for causation concerning a compensable occupational disease under Delaware workers' compensation law. The Superior Court reversed a denial by the Industrial Accident Board (the "Board") of appellant John S. O'Neal's ("O'Neal") claim for total disability benefits. The Board had found that O'Neal failed to prove causation. Initially, a panel of this Court affirmed the Superior Court's decision. *Diamond Fuel Oil v. O'Neal,* Del.Supr., No. 399, 1998 (Jan. 21, 1999) (ORDER). By order dated March 19, 1999, this Court granted Diamond Fuel Oil's motion for rehearing *en Banc.* We now find that substantial evidence does not exist to support the Board's conclusion. Accordingly, we affirm the Superior

Court's reversal of the Board decision and instruct the Superior Court to remand the case to the Board for a determination on the issue of employability and the extent of O'Neal's disability.

I

O'Neal was employed by the employer-appellee Diamond Fuel Oil ("Employer") for approximately nine years prior to being diagnosed with chronic interstitial nephritis, a disease of the kidneys. O'Neal's duties involved service and installation of oil burner equipment and sometimes included cleaning up oil spills on residential basement floors. He also stated that routine maintenance of oil-fired devices would require him to drain oil from the equipment. He would retrieve the oil in a bucket that was then placed in his van until the end of the day when it was dumped into a tank at the shop. He further testified that on occasion he would assist in the cleaning out of tanks, resulting in his standing in two or three feet of oil inside a closed tank. The oil to which he was exposed was heating fuel oil # 2.

O'Neal testified that during the heating season he worked between sixty and eighty hours per week. On cold weather days he would have approximately fifteen to eighteen assignments per day. He also testified that he did not use respiratory equipment.

In June 1995, O'Neal first began to experience flu like symptoms and went to his family physician who referred him to Martin F. Gavin, D.O., ("Dr. Gavin"), a nephrologist, who diagnosed his kidney condition. Dr. Gavin inquired whether O'Neal had been exposed to any chemicals. In response, O'Neal obtained a Material Safety Data Sheet ("MSDS") [1] from Employer.

The MSDS for heating fuel oil # 2 recites that this substance is in the chemical family of petroleum hydrocarbons. The MSDS further provides product health hazard information and warning, including effects of overexposure. With respect to inhalation the MSDS states that "[d]egenerative changes in the liver, kidneys and bone marrow may occur with prolonged, high concentrations." The MSDS further provides that with respect to an acute exposure, physicians should follow patients for several days or weeks for delayed effects including "bone marrow toxicity, hepatic and renal impairment."

In July 1995, O'Neal obtained a second opinion from another nephrologist, Lindsey M. Slater, M.D.[2] ("Dr. Slater"). Ultimately, under Dr. Slater's care, on November 2, 1995, a kidney transplant was performed using a kidney donated by his brother. On March 1, 1996, O'Neal filed a petition to determine compensation due with the Board. O'Neal contended that his kidney condition was a result of exposure to heating fuel oil # 2 during the course and scope of his employment. O'Neal was thirty-five years old at the time of the Board hearing in March, 1997.

Three doctors testified before the Board. The only testifying physician who had actually treated O'Neal was Dr. Slater, a board certified nephrologist. She testified by deposition that she first examined O'Neal in July 1995. She took a complete history and conducted a physical exam. With respect to O'Neal's history, Dr. Slater was looking for a history of chronic medication use, specifically nonsteroidal anti-inflammatory drugs, or chronic urinary tract infections or kidney stones, anything that might lead to "chronic obstructive processes in the kidney." Dr.

---

1. Material Safety Data Sheets are required by federal regulations promulgated by the Occupational Safety and Health Administration, Department of Labor. 29 C.F.R. § 1910.1200(g). All employers are required to provide information to their employees about the hazardous chemicals to which they are exposed. 29 C.F.R. § 1910.1200(b)(1).

2. In an apparent typographical error the Superior Court named Dr. Slater as "Dr. Linda Marie Slater." *O'Neal v. Diamond Fuel Oil,* Del.Super., C.A. No. 97A–09–003–HLA, 1998 WL 731562 at *2 (Aug. 20, 1998).

Slater also stated she explored any kind of work related exposure, specifically lead, and was told about O'Neal's hydrocarbon exposure.

Dr. Slater testified that after examining every possible etiology, the only remaining factor that was not ruled out was hydrocarbon exposure. She stated that "it would seem more likely than not" that the hydrocarbon exposure was the cause of O'Neal's chronic tubular interstitial disease, and that it was the "most probable cause of his renal failure."

Dr. Slater further testified that literature supports a finding that hydrocarbon exposure can cause this type of injury to the kidney. She acknowledged Dr. Gavin's view that he could not ascertain the etiology of the interstitial nephritis from either the history or biopsy. Finally, she testified that the fact that O'Neal did not have any acute symptoms in any other organ of his body did not preclude the fact that the exposure to hydrocarbons within a reasonable probability may have caused his kidney condition.

Lawrence H. Byrd, M.D. ("Dr. Byrd"), a board certified nephrologist, testified via video deposition before the Board. Dr. Byrd reviewed O'Neal's medical records and history, and interviewed O'Neal for approximately one half hour. He testified that with respect to O'Neal's condition there were "absolutely none of the usual predisposing factors or known causes." Dr. Byrd stated that there was fairly substantial literature unearthed by his own research that related hydrocarbon exposure to both acute and chronic forms of kidney disease.

Dr. Byrd testified that based upon a reasonable medical probability he was satisfied that the cause of O'Neal's kidney failure was exposure to hydrocarbons at work. Stated differently, he testified that "[b]ased upon the history that [he] reviewed and obtained from [O'Neal] as well as [the scientific evidence], it [was] within reasonable medical probability that the chronic hydrocarbon exposure at the very least hastened or triggered the loss of kidney function in [O'Neal], even if there was another initiating and pre-existing renal condition," of which he was not aware.

The last physician to testify by deposition, and on behalf of Employer, was Ira M. Epstein, D.O. ("Dr. Epstein"), a board certified nephrologist. Dr. Epstein testified that he reviewed O'Neal's medical records but did not interview or examine O'Neal. Dr. Epstein stated that he could find nothing in the records to determine the cause of O'Neal's condition. Dr. Epstein acknowledged that there is a general belief reflected in literature that there is a connection between hydrocarbon exposure and kidney disease, but no absolute proof. Dr. Epstein testified that no one could state that it is more probable than not that O'Neal's disease of chronic interstitial nephritis was caused by fuel oil exposure. Significantly, Dr. Epstein did not testify that O'Neal's exposure to heating fuel oil # 2 was not a substantial cause of his kidney condition, only that he believed no one could tell the cause from objective medical testing.

## II

On appeal from the decision of the Board, this Court must determine "whether the agency ruling is supported by substantial evidence and free from legal error." *Stoltz Management Co., Inc. v. Consumer Affairs Bd.*, Del.Supr., 616 A.2d 1205, 1208 (1992); 29 *Del.C.* § 10142. " 'Substantial evidence' means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Turbitt v. Blue Hen Lines, Inc.*, Del.Supr., 711 A.2d 1214, 1215 (1998), quoting *Histed v. E.I. Du Pont De Nemours & Co.*, Del.Supr., 621 A.2d 340, 342 (1993). Substantial evidence falls somewhere between a scintilla and a preponderance of the evidence. *Breeding v. Contractors–One–Inc.*, Del.Supr., 549 A.2d 1102, 1104 (1988).

The Board concluded that O'Neal failed to carry his burden of proof with respect to causation. After noting the standard

for establishing causation set forth in *Anderson v. General Motors Corp.*, Del. Supr., 442 A.2d 1359 (1982) and *Air Mod Corp. v. Newton*, Del.Supr., 215 A.2d 434 (1965), the Board held that O'Neal had failed to establish a cognizable link between his disease and some distinctive feature of his job. The Board acknowledged that "[w]hile there are studies that 'suggest' some link between hydrocarbon exposure and chronic kidney disease, there are no studies that are even close to being definitive."

The Board noted that Dr. Slater was the only medical expert to have examined O'Neal, but questioned her ability to give an opinion on causation because she "admitted that the case studies she reviewed" related to acute rather than chronic hydrocarbon exposure. The Board emphasized that Dr. Slater was not aware of the specific chemical makeup of heating fuel oil #2, nor had she ever treated another patient with such exposure.

The Board found that Dr. Byrd "could find no clear cut explanation for" O'Neal's kidney disease and "found no articles that cited heating fuel oil #2 as a cause of chronic kidney disease." The Board then stated that "Dr. Epstein testified that there are multiple causes of the claimant's condition, however, there is no clear cut evidence that heating fuel oil #2 ever caused chronic interstitial nephritis." The Board further found that Dr. Epstein testified that there was "no evidence" in this case that O'Neal's exposure was the cause of his kidney disease.

The Board concluded:

[g]iven the medical testimony in this case, the Board must find that the claimant has not established that his exposure to heating fuel oil #2 was the cause of his kidney disease. The experts could not even tell the Board what hydrocarbons are contained in heating fuel oil #2, let alone if, and what type of, an exposure could 'to a reasonable degree of medical probability' result in the claimant's kidney disease.

Finally, the Board concluded that O'Neal also failed to satisfy his burden of proof by failing to establish that his employment exposed him to a hazard that was distinct from or greater than a hazard attending employment in general. The Board found that there was no evidence to establish that O'Neal's field of employment suffers from a greater incidence of chronic interstitial nephritis than any other "field of endeavor."

In reversing the Board, the Superior Court concluded that the Board misapplied the correct legal standard. The Superior Court ruled that the Board incorrectly required a showing that his employment exposed the claimant to a hazard. The court further noted that the Board confused that which is a medical certainty with that which is legally sufficient to prove causation for occupational diseases.

The Superior Court also noted that the Board, in requiring "[a]n absolute certainty" for O'Neal to meet his burden of proof with respect to causation, set too high a standard. The court ruled that O'Neal was required to show only that his working conditions produced his kidney disease as a natural incident of his occupation, and that his occupation attached a distinct hazard greater than the hazard attending employment in general. The court found that had the Board applied the correct legal standard, there was insufficient evidence to support the Board's finding that O'Neal had failed to prove causation.

Employer contends that the Superior Court faulted the Board for misapplying the *Anderson* standard and then proceeded to misapply the standard itself. Employer further contends that there was no evidence in the record that chronic exposure to heating fuel oil #2 causes kidney failure.

Employer argues also that there was substantial evidence to support the Board's conclusion regarding lack of causation because there was: i) no specific scientific data as to the concentration level to which O'Neal was exposed; ii) a lack of informa-

tion by the experts as to the specific exposure to O'Neal on a daily basis or what exposure levels are required to cause such a condition; and iii) a lack of knowledge by Dr. Slater of the chemical make-up of heating fuel oil # 2 and its specific effect in this case.

## III

█ In *Anderson* this Court set forth the standard for determining a compensable occupational disease under 19 *Del.C.* § 2301(4).[3] We held that the employee must present evidence that "the employer's working conditions produced the ailment as a natural incident of the employee's occupation in such a manner as to attach to that occupation a hazard distinct from and greater than the hazard attending employment in general." 442 A.2d at 1361. The Board found that O'Neal failed to satisfy his burden of proof under *Anderson.* The Board concluded that he failed to demonstrate that his chronic exposure to hydrocarbons, specifically heating fuel oil # 2, through his employment was the cause of his kidney disease. We find that the Board's ruling is not supported by substantial evidence.

It is important to note at the outset that the circumstances of this case do not present, in the usual context, conflicting expert opinions each supported by substantial evidence from which the Board would be free to accept one expert's opinion over another. *DiSabatino Bros., Inc. v. Wortman,* Del.Supr., 453 A.2d 102, 106 (1982); *Downes v. State,* Del.Supr., 623 A.2d 1142 (1993). Employer's expert, Dr. Epstein did not opine as to the cause of O'Neal's kidney disease nor testify that chronic exposure to heating fuel oil # 2 was not a substantial cause of the disease. He merely testified to his belief that no one could opine that O'Neal's exposure was more probable than not the cause of his kidney condition. He also claimed that objective medical testing would not, and could not,

reveal the cause. While Dr. Epstein testified that there was "no clear cut evidence" that heating fuel oil # 2 ever caused chronic interstitial nephritis, he did not testify that it could not cause it and acknowledged that a general belief is reflected in medical literature that there is a connection between hydrocarbon exposure and kidney disease.

O'Neal presented causation evidence through his testimony, the testimony of Drs. Slater and Byrd, and the MSDS. Employer challenges the use of the MSDS emphasizing that the document states the health hazards in terms of "may cause" or "may occur." The regulations pertaining to MSDS define "health hazard" as "a chemical for which there is statistically significant evidence based on at least one study conducted in accordance with established scientific principles that acute or chronic health effects may occur in exposed employees." 29 C.F.R. § 1910.1200(c). The regulations further provide that employers have MSDSs in the workplace for each hazardous chemical that they use, and they shall include, *inter alia,* information regarding the health hazards, "including signs and symptoms of exposure, and any medical conditions which are generally recognized as being aggravated by exposure to the chemical." 29 C.F.R. § 1910.1200(g). Thus, the MSDS for heating fuel oil # 2, identifying it as being in the chemical family of petroleum hydrocarbons and stating that degenerative changes in the kidney are a health hazard that may occur from exposure to prolonged, high concentrations through inhalation, is some evidence of causation. *Cf. Fuller v. Chemical Specialties Mfg. Corp.,* D.C.Ct.App., 702 A.2d 1239, 1241 (1997) (referring to MSDS sheet for chemical as supplying some evidence that a product was hazardous and if inhaled could cause the type of injury suffered).

---

**3.** 19 *Del.C.* § 2301(4) states: " '[c]ompensable occupational diseases' includes all occupational diseases arising out of and in the course of employment only when the exposure stated in connection therewith has occurred during employment."

O'Neal testified to his exposure to heating fuel oil # 2 through nine years of employment with Employer. Dr. Slater testified that in her opinion the hydrocarbon exposure "would seem more likely than not" the cause of his kidney condition and that it was the "most probable cause." Dr. Byrd testified that based upon reasonable medical probability, O'Neal's kidney failure was the result of his work exposure to hydrocarbons.

The Board questioned Dr. Slater's ability to give an opinion on causation because it found that: i) she "admitted that the case studies she reviewed" related to acute rather than chronic hydrocarbon exposure; ii) she was unaware of the specific chemical makeup of heating fuel oil # 2; and iii) she had never treated another patient with exposure to heating fuel oil # 2. While the Board is entitled to discount the testimony of a medical witness on the basis of credibility, it must provide specific relevant reasons for doing so. *Turbitt*, 711 A.2d at 1215.

The reasons stated by the Board do not provide the basis for a wholesale rejection of Dr. Slater's testimony, particularly when viewed in light of the information provided in the MSDS. Nor does Dr. Epstein's unwillingness to opine as to causation or his claim that no other expert could establish causation provide a sufficient basis for negation of the opinions of two qualified experts, one of whom was the treating physician.

The Supreme Court of New Hampshire under circumstances closely analogous to those presented here reversed a board's denial of workers' compensation benefits based upon a conclusion that the claimant had "failed to prove by a preponderance of the evidence that [her condition was] causally related to a risk or hazard of [her] employment" and therefore "failed to meet her burden of proving causation." *Appeal of Kehoe*, N.H.Supr., 141 N.H. 412, 686 A.2d 749, 752 (1996). In *Kehoe*, the claimant presented the testimony of her two treating physicians in support of her claim that exposure to various chemicals while performing her job created a compensable occupational disease. *Id.* at 751.

The court noted that treating physicians have great familiarity with a patient's condition and should be accorded "substantial weight." *Id.* at 753. One such doctor testified that such exposure " 'more probably than not' was causing the symptoms which made the claimant 'unable to work.' " *Id.* at 753. The other treating physician testified similarly that the claimant's condition "was 'causally related to exposure to toxic ... agents in the workplace.' " *Id.*

In *Kehoe*, the employer offered the testimony of two medical experts, but, as here, the experts did not offer a "direct opinion about the causation issue." 686 A.2d at 753. Also like this case, *Kehoe* presented circumstances with no record evidence of a pre-existing condition. *Id.* at 752. The Supreme Court of New Hampshire found that the "overwhelming balance of medical evidence relating to causation [was] the opinions offered by the claimant's treating physicians," and such evidence "consisted of informed medical conclusions, not merely conjectural opinions, based on the claimant's well-documented medical history." *Id.* at 753–54.

Significantly, in *Kehoe* the board had concluded that the treating physician's opinions were largely conjectural based on: i) "none of the doctors" throughout the 1980s being willing to make a diagnosis of the claimant's condition; ii) a lack of prior complaints registered by the claimant about the chemicals encountered at work; and iii) the board's suspicion that the condition of the claimant was "derived from some non-work related cause which no one [had] really pinpointed." *Id.* at 754. The New Hampshire Supreme Court found the board's reasons insufficient to justify its rejection of the claimant's medical evidence. *Id.* We find the reasoning reflected in *Kehoe* to be persuasive.

With respect to Dr. Byrd's testimony, the Board found that although Dr. Byrd opined that O'Neal's nine year exposure to

hydrocarbons lead to his kidney failure, he did not find a "clear cut explanation" and had found no articles that specifically cited heating fuel oil # 2 as a cause of chronic kidney disease. Again we find the Board's reasons for rejecting Dr. Byrd's opinion deficient.

In *Anderson*, this Court affirmed a denial of benefits because the evidence was insufficient as a matter of law to sustain the employee's claim of having incurred an occupational disease, allergic rhinitis, from his employment at the employer's assembly plant. 442 A.2d at 1359. In *Anderson*, the claimant's medical expert testified that, in his opinion, dust and fumes at the plant "triggered" the claimant's breathing difficulty, but couched his testimony in terms of "expectation" or "suspicion" and also diagnosed the claimant's allergy as being attributable to dust, including household dust, and nature's pollens. *Id.* at 1361. We concluded that the "only reasonable conclusion" was that the claimant's disease did not result from the peculiar nature of his employment. *Id.*

We find *Anderson* to be distinguishable. The medical experts testifying on O'Neal's behalf did not couch their testimony in terms of expectation or suspicion but in terms of "reasonable medical probability," "more likely than not" and "most probable." Additionally, unlike the claimant in *Anderson*, O'Neal has identified heating fuel oil # 2, a petroleum hydrocarbon with known health hazards, as a substance to which he was exposed over nine years in the course of his employment in the residential heating oil business. Contrary to the Board's conclusion, O'Neal produced evidence that his employer's working conditions through exposure to heating fuel oil # 2 produced his kidney disease as a natural incident of his employment in such a manner as to attach to his occupation a hazard distinct from and greater than the hazard attending employment in general. *Cf. Hoult v. Worker's Compensation Comm.*, W.Va.Supr., 181 W.Va. 551, 383 S.E.2d 516, 516–17, 518–19 (1989) (reversing denial of benefits for occupational disease fatality when claimant offered evidence decedent was exposed to carbon tetrachloride and benzene vapors for seven years and died of cardiorespiratory and renal failure which had been linked to the prolonged inhalation of such vapors through an American Lung Association publication).

Having examined all of the record evidence presented with respect to causation, we conclude that the Board's conclusion that O'Neal failed to sustain his burden of proof on causation lacks substantial evidential support. Our decision affirming the Superior Court does not end the matter. Since the Board denied O'Neal's claim for compensation on the basis of lack of causation, it must reach the question of the amount of compensation in the light of his employability. 19 *Del.C.* §§ 2324, 2325, 2328; *see, e.g., Ernest Di Sabatino & Sons, Inc. v. Apostolico*, Del.Supr., 269 A.2d 552, 552–53 (1970). Accordingly, the matter must be remanded to the Board to permit a determination of the amount of disability benefits.

The judgment of the Superior Court is AFFIRMED with direction to REVERSE and REMAND the decision of the Industrial Accident Board for further proceedings consistent with this opinion.