# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

CARL FOWLER,                          )
                                      )
    Claimant Below/             )
    Appellant,                  )
      v.                      )    C.A. K23A-01-001 NEP
                                      )
PERDUE FARMS, INC.,                   )
                                      )
    Employer Below/             )
    Appellee.                   )
                                      )
                                      )

Submitted:  July 7, 2023
Decided:  October 18, 2023

## OPINION

*Upon Appeal from the Decision of the Industrial Accident Board*

## AFFIRMED

Walt F. Schmittinger, Esquire, Schmittinger & Rodriguez, P.A., Dover, Delaware, *Attorney for Claimant Below/Appellant.*

Andrea C. Panico, Esquire, and Megan E. Traynor, Esquire, Tybout, Redfearn & Pell, Wilmington, Delaware, *Attorneys for Employer Below/Appellee.*

**Primos, J.**

Before this Court is a second appeal in this case brought by Carl Fowler ("Fowler") against his former employer, Perdue Farms, Inc. ("Perdue"),[1] from the decision of the Industrial Accident Board ("the Board") denying his Petition to Determine Compensation Due ("Petition") for his COVID-19 illness. After this Court remanded Fowler's first appeal, the Board found (1) that Fowler had proven by a preponderance of the evidence that he had contracted COVID-19 at the Perdue plant, but (2) that it was not an occupational disease in the context of his employment.

Perdue operates a poultry processing plant where Fowler worked on a conveyor belt in the box room. While working shifts, he would take breaks in the cafeteria. In late March 2020, he contracted COVID-19 from his exposure in the cafeteria and was hospitalized. He has since been unable to work and remains in a weakened state.

On this second appeal, Fowler argues that, because he contracted COVID-19 in the cafeteria at the Perdue plant, where he faced a "heightened risk" of contracting the disease, his illness is an occupational disease. Perdue contends that, although Fowler contracted COVID-19 at the Perdue plant, his illness is not an occupational disease because it is not a natural incident of his particular occupation in such a way that it "attach[es] to his occupation a hazard distinct from and greater than the hazard attending employment in general."[2] For the reasons that follow, the Board's decision is **AFFIRMED**.

---

[1] The legal name of the employer is apparently "Perdue Farms, Inc.," but the Order issued by the Industrial Accident Board and the Notice of Appeal both designate the employer as "Perdue, Inc." *See* Appellee's Answering Br. at 1.

[2] *Diamond Fuel Oil v. O'Neal*, 734 A.2d 1060, 1066 (Del. 1999).

**FACTUAL AND PROCEDURAL BACKGROUND**[3]

## I.  BOARD HEARING I

On July 14, 2020, Fowler filed the Petition.[4]  On November 17, 2020, the Board held its first hearing ("Board Hearing I").[5]

Fowler began his employment with Perdue in January 2020.[6]  He continued through the state of emergency because his work at the Perdue plant was deemed essential.[7]  His employment consisted of "[s]ending boxes down the conveyor" belt and keeping it "full of boxes" in the box room.[8]  The box room was 80 feet long, 50 feet wide, and had, at most, five workers in it at a time.[9]

Fowler testified that he took up to two thirty-minute breaks during his shift and would spend both in the cafeteria[10] with many other people sitting shoulder to shoulder.[11]  He further testified that there were approximately 200 people in the cafeteria during those breaks.[12]

---

[3] This factual and procedural background section will emphasize the pertinent facts as to whether COVID-19 is an occupational disease in the context of Fowler's employment at Perdue.  Although there is some overlap between that issue and the issue of causation, please see *Fowler v. Perdue Farms, Inc.*, 2022 WL 807327 (Del. Super. Mar. 16, 2022) [hereinafter *Fowler I*], for a more thorough recitation of the facts regarding whether it was more likely than not that Fowler contracted COVID-19 at the Perdue plant.

[4] R. Tab 1, Claimant's Pet. to Determine Compensation Due.

[5] R. Tab 2, Tr. of Bd. Hr'g (Nov. 17, 2020) [hereinafter Tr. of Bd. Hr'g I].

[6] *Id.* at 60.

[7] *Id.* at 85.

[8] *Id.* at 60, 101.

[9] *Id.* at 101.

[10] The terms "cafeteria," "breakroom," and "lunchroom" are used interchangeably throughout the record.  For the sake of consistency, the Court will refer to the room in which Fowler attended lunch and took breaks with his co-workers as the "cafeteria."

[11] R. Tab 2, Tr. of Bd. Hr'g I at 61–62, 78–79.  Fowler testified that there were "so many people" in the cafeteria during breaks that workers would "be close. Like a sardine can, close."  *Id.* at 78–79.

[12] *Id.* at 61.  It was later clarified that the number was between 150 and 170 people.  R. Tab 21, *Fowler v. Perdue Inc.*, IAB Hearing No. 1501167 (Dec. 28, 2022) at 14 n.1 [hereinafter Bd. Order II].

Fowler contracted COVID-19 on or about March 27 to 29, 2020,[13] and tested positive at the emergency room on March 29.[14] The emergency room record stated, "Patient high risk for possible underlying COVID-19 infection. Given that he is still working at Perdue factory over the last two weeks [sic]."[15] On April 4, Fowler returned to the hospital, where he remained for a period of months.[16]

Fowler was never screened, told to wear a mask, or given a COVID-19 test before or during his shifts at the Perdue plant.[17] He never returned to work there.[18]

Ronald Dukes ("Dukes"), the Safety and Security Manager at Perdue, testified about Fowler's employment and the safety measures that were taken at Perdue. On March 13, 2020, Perdue implemented cleaning procedures.[19] On March 24, employees' start times and the tables in the cafeteria were staggered.[20] On March 25, daily sanitization of areas, including the cafeteria, began.[21] As early as March 18, a worker at the facility presented symptoms and later tested positive for COVID-19.[22] Between March 18 and March 27, Perdue had identified 28 employees who potentially had COVID-19, and as a result, they were taken out of work.[23]

---

[13] R. Tab 4, Dep. Tr. of Alfred E. Bacon, III, M.D. (Nov. 16, 2020) at 31 [hereinafter Dep. Tr. of Dr. Bacon I]; *see also* R. Tab 21, Bd. Order II at 4.

[14] R. Tab 2, Tr. of Bd. Hr'g I at 33.

[15] *Id.*; R. Tab 3, Dep. Tr. of Dr. Barrington Brown, M.D. (Nov. 5, 2020) at 77 [hereinafter Dep. Tr. of Dr. Brown].

[16] R. Tab 2, Tr. of Bd. Hr'g I at 17–18, 86–87.

[17] *Id.* at 60–61.

[18] *Id.* at 102.

[19] *Id.* at 104, 115.

[20] *Id.* at 109.

[21] *Id.* at 115.

[22] *Id.* at 112–15.

[23] *Id.* at 113.

4

On March 30, Perdue shut down operations to perform a deep cleaning of the facility.[24] Medical personnel from Bayhealth came to Perdue to administer COVID-19 tests after March 2020.[25] On April 1, temperature checks of employees were instituted.[26] On April 26, dividers were added to the cafeteria.[27]

Alfred E. Bacon, III, M.D. ("Dr. Bacon"), Perdue's retained expert,[28] testified that there are three modes of transmission of COVID-19.[29] The high-risk mode is droplet spread, which is the "number one risk factor."[30] Airborne spread is "very low risk," and surface areas are "minimal risk."[31] Dr. Bacon considered the cafeteria high-risk because people spoke, ate, and chewed food there, droplets spewed throughout the air, and no one wore a mask.[32]

Dr. Bacon explained that a "close contact," i.e., the duration of time it typically takes to contract COVID-19 while near a COVID-positive individual, is considered to be fifteen minutes.[33] Dr. Bacon further explained that the chance of contracting COVID-19 in the cafeteria at Perdue was approximately 10% when there was contact with someone with the illness over a period of 15 minutes, but that that was no different than anywhere else where people gathered in numbers to eat, drink, or socialize.[34]

---

[24] *Id.*
[25] R. Tab 21, Bd. Order II at 15.
[26] R. Tab 2, Tr. of Bd. Hr'g I at 116.
[27] *Id.*
[28] Dr. Bacon is a board-certified internist and specializes in infectious diseases. R. Tab 4, Dep. Tr. of Dr. Bacon I at 5.
[29] *Id.* at 20–21.
[30] *Id.*
[31] *Id.*
[32] *Id.* at 19.
[33] *Id.* at 19–20; *see also id.* at 19 ("It's all a question of timing and how close [one is] to other individuals and lack of mitigating technique.").
[34] *Id.* at 19, 28.

Dr. Bacon was aware that Fowler took breaks in the cafeteria and testified that "[t]here is no doubt that in [the cafeteria] environment he … acquired COVID-19[.]"[35]  Dr. Bacon was aware of Fowler's specific occupation in the box room and described it as "relatively spread out" with workers "clearly more than six or eight feet away."[36]  Dr. Bacon opined that Fowler did not acquire COVID-19 in "the room where he worked[.]"[37]  Dr. Bacon further testified that a chicken processing plant does not "grow the virus."[38]

Barrington Brown, M.D. ("Dr. Brown"), Fowler's primary care physician, testified primarily to the extent of Fowler's injuries.  According to Dr. Brown, when Fowler went to the emergency room, personnel there were aware of an "outbreak at the Perdue factory" at that time.[39]  Dr. Brown agreed with Dr. Bacon that there was "no doubt" that Fowler had contracted COVID-19 in the workplace.[40]

## II.  BOARD ORDER I

On December 31, 2020, the Board denied Fowler's Petition because it found that he had not met his burden of proving by a preponderance of the evidence that he had contracted COVID-19 at Perdue.  The Board did not reach the issue of whether COVID-19 was an occupational disease pursuant to 19 *Del. C.* § 2301, the Delaware's Workers' Compensation Act ("the Act").[41]

---

[35] *Id.* at 22; R. Tab 8, *Fowler v. Perdue Inc.*, IAB Hearing No. 1501167 (Dec. 31, 2020) at 5–6 [hereinafter Bd. Order I].

[36] R. Tab 4, Dep. Tr. of Dr. Bacon I at 9.

[37] *Id.* at 18.

[38] *Id.* at 32 (Q: "[C]hicken processing [] doesn't [] grow the virus or increase the likelihood of you having contracted COVID-19 because of the nature of the business; is that right?" A: "Yes.").

[39] R. Tab 3, Dep. Tr. of Dr. Brown at 78–79.

[40] *Id.* at 32–33.

[41] *See generally* R. Tab 8, Bd. Order I.

## III. FOWLER I

On January 13, 2021, Fowler appealed to this Court.[42] On May 16, 2022, the Court held that the Board had committed legal error and failed to base its decision upon substantial evidence by speculating upon facts not in the record, and had misapplied the burden of proof as to whether Fowler had contracted COVID-19 at Perdue. The Court, however, declined to address whether COVID-19, under these facts, was an occupational disease.[43] The Court reversed and remanded to allow the Board (1) to apply the proper burden of proof as to whether Fowler had contracted COVID-19 at the Perdue plant, and if that was found, then (2) to determine whether COVID-19 should be considered an occupational disease in this case.[44]

## IV. Board Hearing II

On December 2, 2022, on remand, in addition to the testimony from Board Hearing I in 2020, the Board heard significant additional testimony from Dr. Bacon through a pre-hearing deposition.[45]

As to the cafeteria, Dr. Bacon was convinced that Fowler had acquired COVID-19 there "based on the epidemic, the virus, based on the number of humans in the [cafeteria], based on the known history that, if you're near an individual with COVID and you're eating at the same time, you have a ten times likelihood risk of acquiring [the] disease."[46] Dr. Bacon referred to the cafeteria as "a particularly hazardous environment."[47] Dr. Bacon maintained his opinion that there was not a

---

[42] R. Tab 9, Notice of Appeal.
[43] *Fowler I*, 2022 WL 807327, at *4–8.
[44] *Id.*
[45] The Board also heard additional testimony from Dukes regarding the physical aspects of the box room—where Fowler worked—and the cafeteria, and regarding implementation of COVID-19 protocols and mitigation procedures at Perdue in March 2020. *See generally* R. Tab 20, Tr. of Bd. Hr'g (Dec. 2, 2022) at 68–87 [hereinafter Tr. of Bd. Hr'g II].
[46] R. Tab 17, Dep. Tr. of Dr. Alfred E. Bacon, III, M.D. (Nov. 29, 2022) at 22 [hereinafter Dep. Tr. of Dr. Bacon II].
[47] *Id.* at 30.

greater hazard of working at Perdue and eating in its cafeteria than contracting COVID-19 in any work or non-work environment where there were large numbers of people in the same room, and that the hazard was not specific to Perdue.[48]

As to Fowler's employment in the chicken processing industry, Dr. Bacon was not aware of anything different about poultry processing plants or Fowler's job in the box area that had increased his chances of contracting COVID-19.[49] Dr. Bacon's opinion largely boiled down to the essential worker discussion. Dr. Bacon testified that "I do think essential workers, because they [were] in the work environment, [were] at a higher risk than the general population."[50] Dr. Bacon opined that there was a difference between Fowler's work environment compared with that of an unmasked healthcare worker directly exposed to COVID-19 or working in an environment that was known for COVID-19 exposure.[51]

## V.    Board Order II

On December 28, 2022, the Board again denied Fowler's Petition.[52] This time, the Board found by a preponderance of the evidence that Fowler had contracted COVID-19 at Perdue, but that he had not proven that COVID-19 was an occupational disease.[53]

The Board acknowledged that, in theory, COVID-19 could be considered an occupational disease under certain facts.[54] After relying on Dr. Bacon's unrebutted testimony and Delaware Supreme Court precedent, however, the Board found that:

---

[48] *Id.* at 50–51.
[49] *Id.* at 31–34; *see id.* at 27 ("I do not think that the occupation of being a boxer in a chicken plant would predispose him to COVID-19 disease more than any other occupation.").
[50] *Id.* at 28.
[51] *Id.* at 28–29.
[52] R. Tab 21, Bd. Order II at 20.
[53] *Id.* at 14.
[54] *See id.* at 15 (citing *Cacchioli v. Infinity Consulting Sols.*, IAB No. 1501061 (Mar. 9, 2022) (R. Tab 14) (contracting COVID-19 while working at a desk job was not a peculiar and natural incident

8

There is nothing unique about the poultry industry that makes COVID-19 more prevalent or less prevalent … There is nothing unique about the poultry industry or Claimant's job that would put him in closer contact with COVID-19 itself than anywhere else where people gather, eat, drink, or work. There is nothing unique about the Perdue cafeteria that makes it more or less likely to contract COVID-19 than eating at a restaurant or another cafeteria.[55]

The Board described Fowler's case as more of a work environment issue than an occupational hazard issue.[56] It reasoned that "whether it is a workplace or in the world itself … it just depends on volume, numbers, and concentration of humans, so it would be no different at Perdue other than those factors."[57] Further, the "peculiar hazard for [Fowler] was not his specific job, but it was the fact that the cafeteria was a particularly hazardous environment in the context of COVID-19."[58]

The Board found that nothing about Fowler's specific occupation as a boxer predisposed him to COVID-19, unlike the occupation of an unmasked healthcare worker, for example.[59] Fowler's work was in the box area near a conveyor belt, not on the line with chickens, and even if Fowler had been regularly exposed to chickens, "COVID-19 is not a chicken disease as brucellosis is a meatpacking disease."[60]

The Board noted that Fowler "did not produce any evidence of the COVID-19 infection rate in the general public in order to show that it was actually higher at Perdue and the Board certainly cannot obtain that information on its own."[61] Finally,

---

of that specific employment and, therefore, did not rise to the level of an occupational hazard distinct from, and in excess of, that attending employment in general)).

[55] *Id.* at 18–19.

[56] *Id.* at 19 ("The size of the [cafeteria] and how many people are in the [cafeteria] at a time is a question of each employer … The distinct hazard [Fowler] had at Perdue was the [cafeteria] environment, not his actual work environment.").

[57] *Id.* at 18.

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.* at 19 (explaining that 28 out of the 650 workers that worked the nightshift with Fowler were infected, which was only a 4.3% infection rate).

it found that any explanation that Dr. Bacon gave about outbreaks around the country in meatpacking facilities was "purely conjecture."[62]

Thereafter, on January 3, 2023, Fowler filed his second appeal with this Court.[63]

## STANDARD OF REVIEW

In a worker's compensation case before the Board, the claimant bears the burden of proving causation by a preponderance of the evidence.[64] On appeal from the Board, the Court's inquiry is limited to whether the Board's conclusions are supported by substantial evidence and free from legal error.[65] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[66] In making that determination, the Court does not reweigh the evidence, reassess witness credibility, or make its own factual findings or conclusions.[67] Rather, the Court must "search the entire record to determine whether, on the basis of all of the testimony and exhibits before the [Board], it could fairly and reasonably reach the conclusion that it did."[68] "If the Board's decision is free from legal error and supported by substantial evidence, this Court must sustain the Board's decision even if this Court might have decided the case differently if it had come before it in the first instance."[69] Questions of law are reviewed *de novo*.[70]

---

[62] *Id.* at 18.

[63] R. Tab 22, Notice of Appeal.

[64] *Goicuria v. Kauffman's Furniture*, 1997 WL 817889, at *2 (Del. Super. Oct. 30, 1997) ("The claimant has the burden of proving causation not to a certainty but only by a preponderance of the evidence."), *aff'd*, 706 A.2d 26 (Del. 1998) (TABLE).

[65] *Fowler I*, 2022 WL 807327, at *3.

[66] *Id.* (quoting *Breeding v. Contractors-One-Inc.*, 549 A.2d 1102, 1104 (Del. 1988)).

[67] *Christiana Care Health Servs. v. Davis*, 127 A.3d 391, 394 (Del. 2015).

[68] *Fowler I*, 2022 WL 807327, at *3 (quoting *Nat'l Cash Register v. Riner,* 424 A.2d 669, 674–75 (Del. Super. 1980)).

[69] *Gutierrez v. Jamestown Painting*, 2019 WL 972161, at *3 (Del. Super. Feb. 26, 2019).

[70] *Fowler I*, 2022 WL 807327, at *4.

**DISCUSSION**

This appeal places an issue squarely before the Court, namely, whether COVID-19 qualifies as an occupational disease under the facts of this case.[71] Fowler asserts that it does, and that the Board committed "mistakes of fact and law" in concluding otherwise.[72] His argument ultimately fails, however, because he misapplies the standard for occupational disease established in the settled decisional law of this state.

Specifically, Delaware's standard for occupational disease requires that the hazard of contracting the disease as an incident of the claimant's employment must be both (1) "distinct from" and (2) "greater than" that attending employment in general. Fowler's assertions fall short because he focuses upon the second prong to the exclusion of the first. Although Fowler did face, as he puts it, a "heightened risk" of contracting COVID-19 in the cafeteria at the Perdue plant, his COVID-19 did not result from the peculiar nature of his employment, and for that reason the Board correctly determined that his COVID-19 did not qualify as an occupational disease.

---

[71] The Court is not aware of any decision of this Court or of the Delaware Supreme Court previously determining whether COVID-19 qualifies as a compensable occupational disease, and in that sense, this is a case of first impression. The Board, as noted *supra*, has found that COVID-19 could qualify as an occupational disease under the proper facts. *Cacchioli,* IAB No. 1501061 (R. Tab 14).

Elsewhere, there appears to be a paucity of case law on this issue. *See, e.g.*, *PrimeCare Med. of WV, Inc. v. Foster*, 885 S.E.2d 171, 174 n.6 (W. Va. Ct. App. 2023) (explaining that New York and Ohio have addressed this issue—New York found COVID-19 compensable, whereas Ohio denied compensability) (citing *Pierre v. ABF Freight*, 180 N.Y.S.3d 337 (App. Div. 2022); *Yeager v. Arconic Inc.*, 2022 WL 2114656 (Ohio Ct. App. June 13, 2022)).

[72] Appellant's Opening Br. at 27.

11

## I. A Finding of a Compensable Occupational Disease Requires the Presence of a Hazard Not Only "Greater Than" But Also "Distinct From" That Attending Employment in General.

### A. Delaware courts have established the standard for compensable occupational diseases.

The Delaware Supreme Court established the standard for what constitutes a compensable occupational disease in *Air Mod Corp. v. Newton*[73] and *Anderson v. General Motors Corp.*[74] The framework described in those cases has remained unaltered in subsequent Supreme Court and Superior Court decisions, including *Diamond Fuel Oil v. O'Neal*[75] and *Evans Builders, Inc. v. Ebersole*.[76]

Pursuant to the Act, a compensable occupational disease is one "arising out of and in the course of employment only when the exposure stated in connection therewith has occurred during employment."[77] In *Air Mod*, the Supreme Court recognized that the statute left the term "compensable occupational disease" undefined, and then proceeded to provide that definition.[78] The Court expressly rejected as overly broad a previous holding of the Delaware Superior Court defining "compensable occupational disease" as "any disability which arises out of, or is aggravated by, particular conditions of employment."[79] The *Air Mod* Court then

---

[73] 215 A.2d 434 (Del. 1965).
[74] 442 A.2d 1359 (Del. 1982).
[75] 734 A.2d 1060 (Del. 1999).
[76] 2012 WL 5392148 (Del. Super. Oct. 11, 2012), *aff'd sub nom. Evans Builders v. Ebersole*, 2013 WL 2371705 (Del. Feb. 11, 2013).
[77] 19 *Del. C.* § 2301(4). The language of the statute was essentially the same in 1965, when *Air Mod* was decided. *See Air Mod*, 215 A.2d at 441.
[78] *See Air Mod*, 215 A.2d at 441–42. In arriving at that definition, the Court found persuasive the reasoning of New York's highest court in *Detenbeck v. General Motors Corp.*, 132 N.E.2d 840 (N.Y. 1956), and *Harman v. Republic Aviation Corp.*, 82 N.E.2d 785 (N.Y. 1948).
[79] *Air Mod*, 215 A.2d at 441 (citing *Zallea Bros. v. Cooper*, 166 A.2d 723 (Del. Super. 1960); *see also id.* at 441–42 ("There is a common element generally running through the statutory definitions, however: that of the distinctive relation of the disease to the nature of the employment, **as contrasted with diseases which might just as readily be contracted in other occupations, or in everyday life, apart from employment.**") (emphasis supplied).

looked to New York's highest court, which had previously held that an illness "does not become an occupational disease simply because it is contracted on the employer's premises" and that an occupational disease must be "commonly regarded as natural to, inhering in, an incident and concomitant of" the claimant's particular work itself.[80]  Ultimately, the *Air Mod* Court held that a compensable occupational disease "is one resulting from the peculiar nature of the employment, i.e., from working conditions which produce the disease as a natural incident of the particular occupation, attaching to that occupation a hazard different from, and in excess of, the hazards attending employment in general."[81]

In 1982, the Supreme Court in *Anderson* reiterated the *Air Mod* standard and its test, i.e., that "[t]here must be a recognizable link between the disease and some distinctive feature of the claimant's job."[82]  The Supreme Court again explained that the disease cannot result from "stimuli (of) the everyday world."[83]

**B. Later decisions have not altered the standard.**

In 1999, the Supreme Court in *Diamond Fuel* did find that the claimant's ailment was occupational in nature.[84]  The Court, however, applied the same standard it had previously applied in *Air Mod* and *Anderson*.[85]  It held that the claimant's exposure to heating fuel oil #2 was a hazard both greater than, and distinct from, that attending employment in general[86] and reasoned that the claimant's

---

[80] *Id.* at 442 (quoting *Harman*, 82 N.E.2d at 786).
[81] *Id.*; *see also Anderson*, 442 A.2d at 1361 (using the same standard but worded differently, e.g., "a hazard **distinct from and greater than**") (emphasis supplied); *Diamond Fuel*, 734 A.2d at 1064 (same).  For the sake of consistency and in accordance with *Anderson* and *Diamond Fuel*, the more recent Supreme Court decisions, this Court will use the terms "distinct from" and "greater than" hereafter.
[82] *Anderson*, 442 A.2d at 1360 (quoting *Detenbeck*, 132 N.E.2d at 842).
[83] *Id.* at 1361.
[84] 734 A.2d at 1066.
[85] *Id.* at 1064.
[86] *Id.* at 1066.

exposure was a natural incident of his particular occupation as a servicer and installer of oil burner equipment.[87]

In *Evans*, the *Air Mod* and *Anderson* standard was applied by this Court in finding a compensable occupational disease.[88] The Court affirmed the Board because it found that the claimant had contracted mycobacterium avium intracellulare, or "MAI," in connection with his duties as a carpenter in poultry houses and processing plants. MAI was a natural incident of the claimant's particular occupation, in which he was exposed to a hazard greater than, and distinct from, that attending employment in general.[89] The following year, the Supreme Court affirmed the decision.[90]

**C. The Board's use of the term "unique" did not constitute legal error.**

Before reviewing the Board's legal analysis in this case, the Court must address whether the Board applied the proper standard in reaching its decision. Fowler argues that the Board misapplied the standard because it used the word "unique" in its analysis.[91] Specifically, he argues that "[t]here is no requirement that an occupational disease must be 'unique' to Mr. Fowler's employment in particular. The Board thus (again) imposes an incorrect and higher burden of proof on the Claimant, and has thereby erred as a matter of law[.]"[92]

The general rule, established in *Air Mod*, is that a compensable occupational disease under the Act is one that results "from the peculiar nature of the employment."[93] It must be a "natural incident of the particular occupation."[94]

---

[87] *Id.*
[88] *Evans*, 2012 WL 5392148, at *3.
[89] *Id.*
[90] *Evans Builders v. Ebersole*, 2013 WL 2371705 (Del. Feb. 11, 2013).
[91] *See* Appellant's Opening Br. at 27–28; *see also* R. Tab 21, Bd. Order II at 18.
[92] Appellant's Opening Br. at 27–28.
[93] *Air Mod*, 215 A.2d at 442; *Anderson*, 442 A.2d at 1361.
[94] *Air Mod*, 215 A.2d at 442.

Nowhere in the standard and framework laid out by the Supreme Court in *Air Mod* or *Anderson* did the Court use the term "unique."

To the extent that the use of the term "unique" implies that in order for an illness to be compensable as an occupational disease, it must be associated with only one occupation,[95] the Court agrees that this would not be a correct statement of the law. However, the Board here never made such a claim; instead, its analysis demonstrates the opposite.[96] It certainly would have been preferable for the Board to have employed the terminology used by the Supreme Court. This Court is unwilling to find, however, given the context and the Board's full analysis, that the use of that term constitutes reversible legal error.

**D. The Board properly applied the *Air Mod* Standard.**

Under the Act, in order to find that Fowler's COVID-19 was a compensable occupational disease, the hazard of his contracting that disease must have been (1) distinct from **and** (2) greater than that attending employment in general. There must have been a recognizable link between COVID-19 and some distinctive feature of Fowler's job as a boxer at Perdue.[97] For the reasons that follow, this Court finds that the hazard of contracting COVID-19 in the cafeteria at Perdue was greater than that attending employment in general; however, Fowler's illness did not result from the peculiar nature of his employment.

---

[95] "Unique" is defined as: "(1) being the only one of its kind; unlike anything else. (unique to) belonging or connected to (one particular person, place, or thing). (2) special or unusual." *Unique*, CONCISE OXFORD ENGLISH DICTIONARY (12th ed. 2011).

[96] *See, e.g.*, R. Tab 21, Bd. Order II at 18 ("Unlike a healthcare worker who is masked **or** someone who is in a known COVID-19 exposure experience, there is nothing about Claimant's specific occupation that predisposes him to COVID-19.") (emphasis supplied).

[97] *See Air Mod*, 215 A.2d at 442; *see also Anderson*, 442 A.2d at 1360.

### 1. The cafeteria at Perdue presented a <u>greater hazard</u> than that attending employment in general.

Here, the record makes clear that Fowler, more likely than not, contracted COVID-19 in the cafeteria. According to Dr. Bacon's unrebutted testimony, the cafeteria was a "particularly hazardous environment,"[98] which left him convinced that Fowler had acquired it there.[99] The cafeteria was high-risk because people spoke, ate, and chewed food there; droplets spewed throughout the air; and no one wore a mask.[100] The time to establish close contact was only fifteen minutes.[101] Fowler's two breaks in the cafeteria were in thirty-minute intervals and were taken with at least 150 people who sat shoulder to shoulder without masks on.[102] Finally, Dr. Bacon testified that "I do think essential workers, because they were in the work environment, were at a higher risk than the general population."[103]

Accordingly, Fowler has proven that he more likely than not contracted COVID-19 in the cafeteria at Perdue, an environment with a greater hazard than that attending employment in general. Thus, the *greater than* prong is satisfied. That, alone, however, is not enough.

### 2. The hazard of Fowler's contracting COVID-19 at Perdue was <u>not distinct from</u> that attending employment in general.

Pursuant to *Air Mod* and *Anderson*, it is not enough that Fowler contracted COVID-19 on Perdue's premises.[104] Instead, COVID-19 "must be … commonly regarded as natural to, inhering in, an incident and concomitant of, the work in

---

[98] R. Tab 17, Dep. Tr. of Dr. Bacon II at 30.
[99] *See id.* at 22; *see also* R. Tab 4, Dep. Tr. of Dr. Bacon I at 22.
[100] R. Tab 4, Dep. Tr. of Dr. Bacon I at 19–21.
[101] *Id.* at 19–20.
[102] R. Tab 21, Bd. Order II at 14 n.1; R. Tab 2, Tr. of Bd. Hr'g I at 78–79.
[103] R. Tab 17, Dep. Tr. of Dr. Bacon II at 28.
[104] *Air Mod*, 215 A.2d at 442; *Anderson*, 442 A.2d at 1360.

16

question."[105] A disease of everyday life to which the public is exposed is not considered a compensable occupational disease.[106]

### a. COVID-19 is part of the stimuli of the everyday world.

This Court recognizes the concern expressed by the Supreme Court in *Air Mod*, namely, its reluctance to transform the Act into a health insurance statute.[107] This Court shares that same concern. The COVID-19 pandemic does not change that concern; rather, it reinforces it.

The reasoning of the Ohio Court of Appeals in *Yeager v. Arconic Inc.*[108] is persuasive on this subject. There, the Court held that COVID-19 was not a compensable occupational disease where the claimant had contracted the disease after working alongside an infected coworker in a furnace pit while neither employee was wearing a mask: the claimant argued that COVID-19 was peculiar to his employment, and that he was at greater risk of contracting it, because "he was required to work in 'close proximity' to the infected coworker."[109] In rejecting this argument, the Court relied upon an earlier Ohio Court of Appeals decision, *Ingram v. Conrad*,[110] in finding that "a common illness to which the general public is exposed" is not compensable as an occupational disease,[111] and further quoted *Ingram* as follows:

> It is not contemplated by the law makers that the [workers' compensation] law should cover health insurance. It is a matter of

---

[105] *Air Mod*, 215 A.2d at 442 (quoting *Harman*, 82 N.E.2d at 786).
[106] *See Anderson*, 442 A.2d at 1361.
[107] *See Air Mod*, 215 A.2d at 442 (citing *Faline v. Guido and Francis DeAscanis & Sons*, 192 A.2d 921 (Del. 1963), *overruled by Duvall v. Charles Connell Roofing*, 564 A.2d 1132 (Del. 1989)). Notably, *Faline* was expressly overruled by *Duvall* based upon *Faline*'s reliance upon the unusual exertion rule, not upon *Faline*'s specific holding that the Act may not be construed so as to be transformed into a health insurance statute.
[108] 2022 WL 2114656 (Ohio Ct. App. June 13, 2022).
[109] *Id.* at *2.
[110] 2001 WL 1674105 (Ohio Ct. App. Dec. 20, 2001).
[111] *Yeager*, 2022 WL 2114656, at *2 (quoting *Ingram*, 2001 WL 1674105, at *12).

rather common knowledge that "colds," influenza and pneumonia are the result of bacteria—in common parlance, germs—attacking the body. These germs appear and cause epidemics in cities, towns, and counties. It is also a matter of rather common knowledge that many such germs appear to be in the very atmosphere surrounding us, at all times. Any and every person is "exposed" to them without being conscious of the fact. Medical science teaches that we fall victims of these germs because at the time of the attack we are not physically able to withstand their assaults.[112]

Fowler argues that because he contracted COVID-19 on Perdue's premises, it is a compensable occupational disease.[113] Specifically, he argues that pursuant to *Anderson*, "if there was evidence of any incidence of COVID-19 within the employee's work force at Perdue, then the case would be compensable."[114]

Fowler misconstrues the reasoning behind *Anderson*. In *Anderson*, the Supreme Court denied compensation because it found that the claimant's allergic rhinitis was "commonplace" and part of the "stimuli (of) the everyday world" that was attributable not only to household and factory dust, but also to nature's pollens from ragweed, trees, and grass.[115] According to the Court, the evidence in the record failed to establish that the "working conditions" at the plant had produced the claimant's illness "as a natural incident of his occupation,"[116] and the Court specifically acknowledged, as part of the *Air Mod* standard, that an illness "does not become an occupational disease simply because it is contracted on the employer's premises."[117]

---

[112] *Id.* at *3 (quoting *Ingram*, 2001 WL 1674105, at *12).
[113] Appellant's Opening Br. at 25.
[114] *Id.* at 26 (cleaned up) (citing *Anderson*, 442 A.2d at 1361 ("if there had been evidence of any incidence of allergic rhinitis within the employee's work force at the General Motors plant … [then] the case would be different.")).
[115] *Anderson*, 442 A.2d at 1361.
[116] *Id.*
[117] *Id.* at 1360 (quoting *Air Mod*, 215 A.2d at 442).

The singular fact that Fowler contracted COVID-19 in the cafeteria on Perdue's premises is not legally sufficient to classify it as an occupational disease.[118] People from all over Delaware have contracted COVID-19, including people not working as boxers at Perdue. Moreover, COVID-19 can be brought into the workplace, just like the flu or common cold. Dr. Bacon testified that anyone could contract COVID-19, and that "it all depends on volume and numbers and concentration of humans[.]"[119]

From the inception of the pandemic, COVID-19 was prevalent in multiple work and non-work environments in which there was close proximity of large groups for an extended time. As to work environments, Dr. Bacon testified that contracting COVID-19 in the cafeteria at Perdue was "no different" than contracting it at any other business, such as at Home Depot or Lowe's.[120] As to non-work environments, Dr. Bacon testified that the risk was the same if someone went to a "super-spreader" event, e.g., a wedding, funeral, college cafeteria, restaurant, or bar.[121] Dr. Bacon further explained that, in comparison, Christiana Hospital's cafeteria holds roughly 400 people.[122] Certain employers could have had a more, or less, hazardous cafeteria environment than other employers, but that, again, is a hazard attending employment in general.[123]

### b. COVID-19 is not a natural incident of Fowler's peculiar occupation as a boxer in the poultry industry.

Delaware courts have refused to find a compensable occupational disease where the disease is not caused by the peculiar nature of the occupation itself.[124] The

---

[118] *See id.*

[119] R. Tab 4, Dep. Tr. of Dr. Bacon I at 32.

[120] *Id.*

[121] *Id.* at 39.

[122] R. Tab 17, Dep. Tr. of Dr. Bacon II at 31.

[123] *See id.* at 31–32.

[124] *Air Mod*, 215 A.2d at 441–42; *Anderson*, 442 A.2d at 1360–61.

19

disease must be commonly regarded as "natural to, inhering in, an incident and concomitant of" the claimant's particular occupation.[125]

*Diamond Fuel* and *Evans* are instructive. In *Diamond Fuel*, the Supreme Court affirmed this Court's reversal of the Board's determination that the claimant had not proven causation.[126] There, the experts testified to a degree of reasonable medical probability that exposure to heating fuel oil #2 had led to the claimant's kidney disease as a result of his specific occupation as a servicer and installer of oil burner equipment.[127] The claimant routinely conducted maintenance of oil-fired devices that required him to drain oil from the equipment, retrieve oil in a bucket, leave the bucket in his car overnight, dump oil into the tank at the shop, and clean out the then-filled oil tanks in which he had to stand inside the tank that was filled with two or three feet of oil.[128]

*Diamond Fuel* is distinguishable on its facts. Unlike the claimant's work functions in *Diamond Fuel*, nothing about Fowler's work-related activities as a boxer directly exposed him to COVID-19. In Fowler's own words, his employment consisted of "[s]ending boxes down the conveyor" belt.[129] The box room itself was "relatively spread out," and workers were "clearly more than [six or eight] feet away."[130] Dr. Bacon opined that Fowler did not acquire COVID-19 in "the room where he worked."[131] Dr. Bacon further opined that there was a difference between Fowler's work environment compared with that of an unmasked healthcare worker directly exposed to COVID-19.[132] Thus, there is nothing natural to, inhering in, or

---

[125] *Air Mod*, 215 A.2d at 442 (quoting *Harman*, 82 N.E.2d at 786); *Anderson*, 442 A.2d at 1360 (quoting *Harman*, 82 N.E.2d at 786).
[126] 734 A.2d at 1060–61.
[127] *Id.* at 1061, 1066.
[128] *Id.* at 1061.
[129] R. Tab 2, Tr. of Bd. Hr'g I at 60.
[130] R. Tab 4, Dep. Tr. of Dr. Bacon I at 9.
[131] *Id.* at 18.
[132] R. Tab 17, Dep. Tr. of Dr. Bacon II at 28–29.

an incident and concomitant of his particular occupation as a boxer that exposed Fowler to COVID-19.

Evans is also distinguishable on its facts. There, the claimant worked as a carpenter in poultry houses and processing plants.[133] The claimant was hospitalized for pneumonia and diagnosed with mycobacterium avium intracellulare ("MAI").[134] The claimant's expert testified that "this guy basically did construction on chicken coops and tore them apart and rebuilt them for years" and that the soil in the areas where he worked was a "reservoir" for the MAI organisms.[135] The claimant's expert further testified that the MAI organism was more common in the poultry industry than in other environments, and in particular was prevalent around sawdust, soil, and chickens, and that "intense exposure to the MAI organism in the poultry environment was 'very likely the cause of the development of [the claimant's] infection.'"[136]

Here, however, in direct opposition to Evans, there was no evidence presented that COVID-19 was distinctive to the environment of a poultry processing plant. Dr. Bacon testified that "I do not think that the occupation of being a boxer in a chicken plant would predispose him to COVID-19 disease more than any other occupation."[137] Further, Dr. Bacon opined that chicken processing neither grows COVID-19 nor increases the likelihood of contracting it.[138] COVID-19, unlike MAI, is not a poultry-related disease.[139]

Fowler makes no mention of any specific work-related duties as a boxer that caused him to contract COVID-19. Instead, he argues that—by mere virtue of meat

---

[133] Evans, 2012 WL 5392148, at *1.
[134] Id. at *2.
[135] Id.
[136] See id. at *2–3.
[137] R. Tab 17, Dep. Tr. of Dr. Bacon II at 27.
[138] R. Tab 4, Dep. Tr. of Dr. Bacon I at 31–32.
[139] See Evans, 2012 WL 5392148, at *2; see also R. Tab 21, Bd. Order II at 18.

processing workers' having contracted COVID-19 at a higher rate because they were essential workers—COVID-19 is an occupational disease.[140] Specifically, he argues that "*despite the special hazard* in such employment, production operations were required to continue."[141]

To support this argument, Fowler points to the federal executive order issued pursuant to the Defense Production Act of 1950[142] requiring meat processing facilities to remain open during the pandemic.[143] Notably though, that order was issued on April 28, 2020, well after Fowler contracted COVID-19.[144] Moreover, during the COVID-19 pandemic, employees in a number of professions—including lawyers—were deemed essential.[145] This cuts against Fowler's arguments because it demonstrates that employees of all professions that were deemed essential faced a risk of contracting COVID-19. Moreover, all other Perdue employees faced the same risk regardless of their particular occupations at the plant. It follows that COVID-19 cannot be a hazard distinct from that of employment in general in a situation in which all other essential workers faced the same disease every day by attending employment. Furthermore, there is no logical distinction between the government's requiring an employee to report to work and an employer's requiring it.

Fowler also faults the Board for failing to address the findings of the House Select Subcommittee on the Coronavirus Crisis concerning the high rates of

---

[140] Appellant's Opening Br. at 28–29.

[141] *Id.* at 29 (emphasis in original). Fowler also argues that the "special hazard" was that "Fowler, and all of his co-employees, were at a peculiar risk of contracting COVID-19 because they worked there[.]" *Id.* at 33.

[142] *See* App. to Appellant's Opening Br. (D.I. 13) at 221–22 (citing 50 U.S.C. § 4501 *et seq.*).

[143] Appellant's Opening Br. at 33.

[144] R. Tab 16, Congressional Report of May 2022 at 29, 31; App. to Appellant's Opening Br. (D.I. 13) at 221–22.

[145] R. Tab 17, Dep. Tr. of Dr. Bacon II at 31–32.

22

COVID-19 infection in meatpacking plants.[146]  Ultimately, however, this supports only the second prong of the occupational disease test, not the first.  Specifically, there was no finding by the Subcommittee that COVID-19 was more prevalent in meatpacking facilities due to the occupations of the individual workers.  Rather, the subcommittee cited inadequate masking and barriers as leading to the high infection rates: not only were such measures not peculiar to poultry or other meatpacking plants, but there is no indication in the record of the extent to which these measures had even been recommended by late March 2020, when Fowler was infected.[147]

In sum, from the early stages of the pandemic, COVID-19 became part of the "stimuli of the everyday world,"[148] and nothing peculiar to Fowler's work-related duties as a boxer at Perdue subjected him to direct exposure to COVID-19.  For these reasons, the Board committed no error in concluding that Fowler's COVID-19 did not qualify as an occupational disease.

## II.  To the Extent That the Board's Decision Was Dependent Upon Its Factual Findings, Deference to the Board Is Required.

On appeal from the Board, this Court's inquiry is limited to whether the Board's conclusions are supported by substantial evidence and free from legal error.[149]  This Court does not reweigh the evidence, reassess witness credibility, or make its own factual findings or conclusions.[150]

---

[146] *See* Appellant's Opening Br. at 29–30.

[147] *See generally* R. Tab 15, Congressional Report Memorandum dated Oct. 27, 2021.

[148] *See also Burns v. Wilson*, 2015 WL 413452, at *7 (Del. Super. Jan. 30, 2015) ("Because mold and mildew are not hazards caused by the specific nature of working in a tire store, but are hazards that might just as readily be encountered in other occupations or in everyday life apart from employment, the Court finds that any alleged failure by [the claimant's former attorney] to present evidence related to mold/mildew is harmless error and not a proximate cause of [the claimant's] failure to prevail on his IAB claim.").

[149] *Fowler I*, 2022 WL 807327, at *3.

[150] *Davis*, 127 A.3d at 394.

23

Here, the Board's decision is supported by substantial evidence in the record. Fowler's arguments to the contrary notwithstanding, the evidence in the record does not compel this Court to reach a different result, particularly in light of the principle that factual determinations made by the Board are given deference.

The Board found Dr. Bacon's testimony "unrebutted."[151] As to whether COVID-19 was an occupational disease, the Board credited Dr. Bacon's testimony that there was nothing different about contracting it in Perdue's cafeteria than "anywhere else where people are gathering to eat and drink, such as in a restaurant or social gathering."[152] Dr. Bacon testified that that there was nothing about the poultry processing plants, or Fowler's work in the box area, that subjected him to an increased risk of contracting COVID-19.[153] Further, Dr. Bacon opined that all essential workers were at a higher risk than the general population.[154]

The Board found that the "peculiar hazard for [Fowler] was not his specific job, but rather, it was the fact that the cafeteria was a particularly hazardous environment in the context of COVID-19."[155] According to the Board, "[t]he same hazard is specific to any event or circumstance where there is a large number of people in the same room together."[156] It accepted Dr. Bacon's testimony that "there was not a greater hazard of working at Perdue and eating in the [cafeteria] for [Fowler] to contract COVID-19 than contracting it in the employment environment in general." [157] The Board further found that Fowler "did not produce any evidence of the COVID-19 infection rate in the general public in order to show that it was

---

[151] R. Tab 21, Bd. Order II at 19.
[152] *Id.* at 17–18.
[153] *Id.*
[154] *Id.* at 18.
[155] *Id.*
[156] *Id.* at 19.
[157] *Id.*

actually higher at Perdue and the Board certainly cannot obtain that information on its own."[158]

In short, this Court will not substitute its judgment for that of the Board as to credibility or factual findings and sees no reason to disturb the Board's decision.

## CONCLUSION

For the foregoing reasons, the Board's conclusion that COVID-19 was not a compensable occupational disease under the facts of this case is free from legal error and supported by substantial evidence in the record. Accordingly, the Board's denial of Fowler's Petition for Compensation Due is **AFFIRMED**.

_____
Noel Eason Primos, Judge

NEP:tls
*Via File & ServeXpress*
oc: Prothonotary
cc: Counsel of Record

---

[158] *Id.*